IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

No. 98-40338

TRAVIS ALTON; ET AL

Plaintiffs

TRAVIS ALTON

Plaintiff-Appellant

versus

TEXAS A&M UNIVERSITY; ET AL

Defendants

THOMAS DARLING; MALON SOUTHERLAND;
ROBERT H DALTON; M T "TED" HOPGOOD,
Major General

Defendants-Appellees

Appeal from the United States District Court
for the Southern District of Texas

February 22, 1999

Before HIGGINBOTHAM, BENAVIDES, and DENNIS, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

This is an appeal from a grant of summary judgment to officials of Texas A&M University, based on qualified immunity to a claim for money damages for a deprivation of constitutional rights, arising out of the hazing of a student member of its Corps of Cadets. The Corps is a voluntary student military training organization with over 2100 members. Its chain of command runs

from student cadet leaders to the Commandant of the Corps, a retired U.S. Marine Corps General. Travis Alton is a former member of the Corps of Cadets and filed this suit against certain cadets, "student defendants"; the present Commandant of the Corps, Major General Ted Hopgood; the former Commandant of the Corps, Major General Thomas Darling; the Vice-President for Student Affairs, Dr. Malon Southerland; and the faculty advisor to the Fish Drill Team,[1] Captain Robert Dalton, collectively, "defendant officials". Alton asserts claims under 42 U.S.C. § 1983 stemming from the injuries inflicted by the student defendants. We address Alton's claims against only the defendant officials in this appeal.

I

Alton alleges that during the week of January 6 through January 13, "hell week" for the Fish Drill Team, upperclassmen drill team cadet advisors known as hounds beat him nightly and once taped his head like a mummy, twisting and jerking his chapped lips. Alton's treatment during hell week was not reported to school authorities.

Alton alleges that about three weeks later, while the drill team was preparing for a competition, the student defendants beat Alton for botching a drill movement and instructed him to tell the other members of the drill team the penalty for miscues. The drill team later finished second at the meet and the student

---

[1]The Fish Drill Team is a precision rifle drill unit made up only of freshmen cadets.

defendants punished the team for that "failure" during practice on February 12, 1997. Alton asserts that, as part of his punishment, he was knocked down, kicked in the ribs, and made to run until exhaustion. These incidents were not reported. However, Alton did confide in his brother, who told their parents. Alton's parents then asked Colonel Joe Hoffman, an administrator of the Corps of Cadets, to investigate.

Meanwhile, before the parents called, former cadet Hanson, the senior cadet advisor to the drill team, told Captain Dalton, the team's faculty advisor, of a rumor that upperclassmen beat an unidentified freshman. On March 21, Captain Dalton met with Alton. Alton, however, denied that the incidents had occurred. Alton now explains that he did so because of pressure from former Cadet Hanson.

After this meeting, Captain Dalton asked Colonel McClesky, the Chief of Operations and Training and overseer of cadet misconduct investigations, whether any investigation was underway regarding the beating rumor. Colonel McClesky told Dalton that he thought Colonel Ruiz, head of the Army ROTC, might know something about it, but Ruiz would not be available until Monday, March 24, 1997. Alton alleges that Captain Dalton tried to schedule a meeting that day, Friday, March 21, 1997, with General Hopgood and the others in the chain of command to discuss the situation, but Colonel Ruiz was not available and the meeting was postponed until the 24th. Alton

3

claims that he had no protection over the weekend and that the officials did nothing to prevent further hazing.

On Saturday night, Alton faced a "hound interview," part of a selection process for cadet advisors to the drill team. According to Alton, at the interview, cadets poked him in the eye, punched him, and then told him to sit down on a stool and relax. Then, after turning out the lights, the cadets punched him. When the lights were turned on again, the cadets handed a knife to Alton and told him to cut himself, which he did. The cadets then told Alton that "this never happened."

At 8:15 a.m. on Monday, March 24, Captain Dalton and Colonel Ruiz discussed the rumored beating incident. Captain Dalton was instructed to set up a meeting for that day with the student defendants. After Captain Dalton left, Alton and his parents met with General Hopgood and the colonels. According to General Hopgood, it was apparent that Travis Alton recently had been hazed and abused. The General then acted swiftly and dramatically: He suspended all nine cadets implicated and ordered them out of the Corps residential facilities. After hearings held by Student Conflict Resolution Services, the nine cadets were expelled or suspended for hazing. They were later indicted, and criminal proceedings were pending at the time summary judgment was granted in this case.

Despite General Hopgood's action, on July 8, 1997, Alton filed his complaint in the United States District Court. The district

4

court granted summary judgment to the defendant officials on qualified-immunity grounds. This ruling alone is before this court.

II

This court reviews summary judgment rulings de novo, applying the same standards as did the lower courts. See In re Hudson, 107 F.3d 355, 356 (5th Cir. 1997). Summary judgment is proper only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A dispute about a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant, or where it is so overwhelming that it mandates judgment in favor of the movant, summary judgment is appropriate. See Armstrong v. City of Dallas, 997 F.2d 62, 67 (5th Cir. 1993).

To state a claim under § 1983 for violation of the Due Process Clause, as Alton attempts to do in this case, plaintiffs "must show that they have asserted a recognized 'liberty or property' interest within the purview of the Fourteenth Amendment, and that they were intentionally or recklessly deprived of that interest, even

5

temporarily, under color of state law." <u>Griffith v. Johnston</u>, 899 F.2d 1427, 1435 (5th Cir. 1990) (citations omitted).

                                    III

Alton's § 1983 substantive due process claim is grounded upon a right to bodily integrity. Of course, "[t]he right to be free of state-occasioned damage to a person's bodily integrity is protected by the fourteenth amendment guarantee of due process." <u>Doe v. Taylor</u>, 15 F.3d 443, 450-51 (5th Cir. 1994)(en banc). Alton makes two arguments for imposing § 1983 liability upon the defendant officials: (1) the state-actor cadets violated Alton's constitutional right to bodily integrity by subjecting him to physical abuse, and the defendant officials are liable because the cadets' conduct can be imputed to them; and (2) Alton's injuries were the result of the officials' implementing and condoning the Corps' custom and policy of hazing.

Neither side disputes that the defendant officials are state actors. The student cadet leaders of the Corps are vested with authority over the less senior cadets and serve as a link in the chain of command between a freshman, like Alton, and the officials who oversee the Corps. Considering this authority and the unique paramilitary structure of the A&M Corps of Cadets, the student cadet leaders in this particular situation were arguably acting under color of state law. We will assume so, although we need not pause to decide this point, given our ready disposition of the appeal on grounds we will explain.

Even if we assume arguendo that the student cadet leaders acted under color of state law, and we do not decide the question, Alton's first basis for holding the defendant officials liable -- imputation of the cadets' conduct -- fails. Supervisory officers, like the defendant officials, cannot be held liable under § 1983 for the actions of subordinates, like the cadets, on any theory of vicarious liability. See Monell v. Department of Social Services, 436 U.S. 658, 691-95 (1978); Bennett v. City of Slidell, 728 F.2d 762, 767 (5th Cir. 1984) (en banc). Only the direct acts or omissions of government officials, not the acts of subordinates, will give rise to individual liability under § 1983. See Coleman v. Houston Indep. Sch. Dist., 113 F.3d 528, 534 (5th Cir. 1997). The officials, however, may be liable when enforcement of a policy or practice results in a deprivation of federally protected rights. See Doe v. Dallas Indep. Sch. Dist., 153 F.3d 211, 215-16 (5th Cir. 1998).

In Doe v. Taylor, we noted the close relationship between the elements of municipal liability and an individual supervisor's liability and concluded that a supervisory official may be liable under § 1983 if that official demonstrates a deliberate indifference to a plaintiff's constitutionally protected rights. See Taylor, 15 F.3d at 453. Likewise, in Scott v. Moore, we explained in the pretrial detention context that a detainee could succeed in holding a municipality liable for a due process

violation if the detainee could show that a municipality employee's act resulted from a municipal policy or custom adopted or maintained with objective indifference to the detainee's constitutional rights. Scott v. Moore, 114 F.3d 51, 54 (5th Cir. 1997).

In sum, the officials' conduct must be measured against the standard of deliberate indifference. Alton must establish the following:

1. The officials learned of facts or a pattern of inappropriate hazing behavior by a subordinate pointing plainly toward the conclusion that the subordinate was abusing the student;

2. The officials demonstrated deliberate indifference toward the constitutional rights of Alton by failing to take action that was obviously necessary to prevent or stop the abuse; and

3. The officials' failure caused a constitutional injury to Alton. See Doe, 15 F.3d at 454.

Alton's evidence in the summary judgment record consists of a summary of twenty-eight incidents and the official reaction to them during a two-year period. The district court found that few of the listed incidents appeared to rise to the level of a constitutional injury and that no misconduct that approached the severity of the conduct alleged in this case was ever reported to the officials. While this evidence supports an inference that the officials knew of hazing incidents within the Corps, there is no evidence that in responding to the incidents the officials acted with deliberate indifference in preventing abuse. On the contrary, according to

8

the evidence in the summary judgment record, the officials acted to prevent hazing and to punish hazing activities.

Turning directly to the incidents concerning Alton, he told the officials that no hazing had occurred. Despite Alton's denial, the defendant officials scheduled a meeting to consider the possibility that he was being hazed. We are not pointed to sufficient evidence that the school officials learned of facts or a pattern of misbehavior that would lead a reasonable official to believe that Alton's constitutional rights were being violated. Perhaps the officials may have been negligent, though we do not make that suggestion, in failing to realize Alton was coerced into lying about his abuse and failing to take immediate steps to prevent the possibility of further abuse to Alton over the weekend, but this cannot fairly be described as deliberately indifferent conduct. The evidence shows that when the physical abuse of Alton was brought to the officials' attention, they took immediate and firm action. It is also uncontroverted that the officials tried to educate cadets and their parents about the Corps anti-hazing policy and took disciplinary action in response to reports of cadet misconduct.

The standard of deliberate indifference is high. See Doe v. Dallas Indep. Sch. Dist., 153 F.3d 211, 218 (5th Cir. 1998). Actions and decisions by officials that are merely inept, erroneous, ineffective, or negligent do not amount to deliberate

indifference and do not divest officials of qualified immunity. See id. Alton did not demonstrate that there is a genuine issue of fact as to whether the officials' conduct reflected a conscious disregard for the risk that students would suffer bodily injuries of constitutional dimensions at the hands of student cadet leaders.

We have found no record support for the assertion that defendants were deliberately indifferent to Alton's rights. It follows that plaintiffs' second theory -- that defendant officials implemented, condoned, approved, and conspired to cover up the Corps' custom and policy of hazing -- must fail, a fortiori. We recognize that Alton attempts to prove that the official face of not tolerating abuse of cadets by fellow cadets was false; that by the nod and turn of the eye a pattern and custom of abuse was perpetuated class to class and generation to generation. But Alton's firm belief that this is the reality of the Corps is not the requisite proof. Nor are we insensitive to the reality that his proof may be made the more difficult by deep loyalties of participants internal to the very custom Alton would prove. And there is a related second reality: "military hazing itself may appear abusive to those unfamiliar with its objectives." Indeed, the ratlines of V.M.I. are described by Justice Ginsburg in United States v. Virginia, 518 U.S. 515 (1996), as an opportunity not to be denied females. Given the fine and murky line between the permissible and the impermissible, we ought not repudiate an

10

official who conducted a careful investigation into questioned conduct.

V

Alton also faults the district court for relying on facts outside of the record to support its summary judgment decision. These non-record facts about which Alton complains are said to be evidenced by statements by the district court extolling the qualities of Texas A&M and considering the policy ramifications of its decision. While extolling a distinguished university is best left to other venues, we are not persuaded that any error here was prejudicial.

AFFIRMED.