United States Court of Appeals
Fifth Circuit

**F I L E D**

**August 25, 2004**

Charles R. Fulbruge III
Clerk

**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

No. 02-11362

NICOLAS HERNANDEZ, on behalf of Eric Hernandez,
Individually; JUANA OLALDE, on behalf of
Eric Hernandez, Individually,

Plaintiffs-Appellees,

versus

TEXAS DEPARTMENT OF PROTECTIVE AND
REGULATORY SERVICES; ET AL.,

Defendants,

LOIS LILLY; DIANE PURDIN,

Defendants-Appellants.

Appeal from the United States District Court
for the Northern District of Texas

Before DAVIS, WIENER, and STEWART, Circuit Judges.

CARL E. STEWART, Circuit Judge:

This case involves a foster care placement that tragically ended in the death of a minor, Eric

Hernandez ("Eric"), while he was in the custody of a state licensed foster family. The natural parents,

Nicholas Hernandez and Juana Olalde (collectively, "the natural parents"), brought this action against

former and current employees of the Child Protective Services ("CPS" or "the agency"), an arm of the Texas Department of Protective and Regulatory Services ("TDPRS"), alleging violations of 42 U.S.C. § 1983 and asserting state law negligence claims in connection with the tragic death of young Eric. Prior to Eric's deat h, State CPS officials Lois Lilly ("Lilly") and Diane Purdin ("Purdin") (collectively, "the social workers") removed the infant child, pending an investigation into suspected child abuse, from the guardianship of his natural parents. On appeal, Lilly and Purdin contend that the district court erred in its denial of their motion for summary judgment on the grounds of qualified and official immunity. For the reasons that follow, we conclude that Lilly and Purdin were entitled to qualified and official immunity, and therefore the district court's denial of the motion to dismiss the claims against Lilly and Purdin is reversed.

## FACTUAL AND PROCEDURAL BACKGROUND

The events leading to the present case, though brief in form, are tragic in fact. On February 27, 1999, Juana Olalde ("Olalde") took her seven-week-old son Eric to the Childrens' Medical Center in Dallas, Texas, where he was diagnosed with a spiral fracture of the right femur. Olalde claimed that she tripped and fell while carrying young Eric in her arms. Because Olalde's explanation was not consistent with Eric's injury, medical personnel became suspicious of the circumstances surrounding the accident. Pending an investigation into the accident, CPS workers removed Eric from the custody of his natural parents, without consent or a court order, and the State assumed sole supervision of Eric.

CPS officials placed Eric in the home of the Clauds, a foster family with a prior history of negative reports concerning child care. The Clauds' home was frequently described by CPS case workers as "junky" and reportedly "smelled of cigarette smoke." Anonymous callers also complained

2

that the Clauds sent the foster children to daycare "in dirty diapers" with too few and unsterilized bottles. Moreover, in September of 1998, Mrs. Claud brought a child to CPS with a swollen jaw that was beginning to bruise. In her response to the incident, Mrs. Claud explained that the child "just woke up with it this morning." CPS case worker Patty Zukas brought the swollen jaw incident to the attention of Purdin and another case worker. Additionally, in October of 1998, Purdin learned that Mrs. Claud placed a device on a foster child's bedroom doorknob, which effectively locked the child in its room, in violation of licensing standards. Following an investigation of the incident, Mrs. Claud agreed to no longer use the device in her foster home.

On January 19, 1999, a "priority 1— Physical Abuse" referral was made to the Clauds' home after a case worker observed bruises on each of two children in the care of the Clauds. One child had a brownish bruise on her right thigh and the other child had a greenish bruise on the right side of her buttocks. Mrs. Claud expressed bewilderment as to the source of the bruises, but suggested that the injuries may have result ed from the children "jumping on the bed." CPS case worker Lilly investigated the allegations and ruled out abuse. During the home visit, Mrs. Claud suggested that the bruises probably stemmed from the children "climb[ing] and run[ning] into things."

An anonymous caller reported, on January 28, 1999, that Mrs. Claud would lock the children in a closet while she worked on crafts. The caller also suggested that the foster parents were told of upcoming visits and thus had a chance to spruce up the home to impress CPS workers. The next day, Lilly returned to the Claud home and determined that it was unlikely that the children "could be locked in a closet without destroying the closet." Lilly again ruled out abuse.

Despite these reports, on February 27, 1999, CPS officials placed Eric in the custody of the Clauds. Days later, on March 7, 1999, Mrs. Claud placed Eric on his stomach to sleep. When the

3

Clauds returned several hours later, they discovered that Eric was lying face down in the pillow. The Clauds rushed Eric to the Charleton Methodist Hospital in the early hours of March 8, 1999, where Eric was pronounced dead from positional asphyxia.

The natural parents filed the present civil action on October 7, 1999, against the Clauds and TDPRS. On May 15, 2001, the natural parents amended their complaint to also include the TDPRS Regional and State Directors and the TDPRS State Social Workers. The natural parents' complaint presented state law negligence claims and five theories of liability under Section 1983 for the following: deliberate indifference, lack of professional judgment, unconstitutional conditions of confinement, failure to adequately train the Clauds and placement workers, and state-created danger.

On September 7, 2001, several state defendants were dismissed by the district court pursuant to FED.R.CIV.P. 12(b)(6). The natural parents' reached a settlement with the Clauds on February 19, 2002. The natural parents' action against the remaining defendants, Regional Director Wayne Hairgrove and State social workers Amy Millender, Lilly, and Purdin, alleged that those defendants were in violation of Section 1983 for being deliberately indifferent to Eric's rights and well-being; failure to exercise professional judgment when making the decision to place Eric in the Clauds' foster home; and failure to adequately train the Clauds as foster parents. The natural parents also alleged state law negligence claims against the remaining defendants.

The remaining defendants moved for summary judgment on July 31, 2002, based on both qualified immunity for the natural parents' federal claims and official immunity as to their state law claims. On November 22, 2002, the district court granted summary judgment as to Hairgrove and Millender, and denied summary judgment as to Lilly and Purdin, finding a triable issue of fact regarding the alleged deliberate indifference. Specifically, the district court found summary judgment

4

improper with respect to Lilly and Purdin, based on its determination that a genuine issue of material fact existed as to whether these defendants perceived a substantial risk of harm to any child the agency placed in the Claud home. The district court therefore denied qualified immunity for the federal law claims. In its summary judgment ruling, the district court also denied Lilly and Purdin official immunity for the state law claims, finding that the social workers' good faith was sufficiently controverted by the natural parents' evidence of deliberate indifference. This interlocutory appeal followed.

## DISCUSSION

### I.    Appellate Jurisdiction

Prior to reaching the merits, we must first verify, *sua sponte*, that our jurisdiction over this appeal is proper. Mowbray v. Cameron County, 274 F.3d 269, 279 (5th Cir. 2001). This court has jurisdiction over "all final decisions of the district courts," except those immediately appealable to the Supreme Court. 28 U.S.C. § 1291 (2000). Under the collateral order doctrine, a district court's order denying summary judgment predicated upon qualified immunity, although interlocutory in nature, is an immediately appealable "final decision" to the extent that the denial of summary judgment turns on an issue of law. Mitchell v. Forsyth, 472 U.S. 511, 530 (1985); see also Behrens v. Pelletier, 516 U.S. 299, 307 (1996) ("Mitchell clearly establishes that an order rejecting the defense of qualified immunity at either the dismissal stage or the summary judgment stage is a 'final' judgment subject to immediate appeal").

Our jurisdiction over an appeal from the denial of qualified immunity depends on the reasons for the denial; that is, we have no jurisdiction if the denial was based on the existence of disputed issues of fact. Kinney v. Weaver, 367 F.3d 337, 347 (5th Cir. 2004) (en banc) ("[I]n an interlocutory

5

appeal we cannot challenge the district court's assessments regarding the sufficiency of the evidence — that is, the question whether there is enough evidence in the record for a jury to conclude that certain facts are true."). We do, however, have jurisdiction to decide whether the district court erred in concluding as a matter of law that officials are not entitled to qualified immunity on a given set of facts. Id. Stated differently, our jurisdiction is proper only to the extent that the appeal concerns the purely legal question whether the defendants are entitled to qualified immunity on the facts that the district court found sufficiently supported in the summary judgment record. Id. See also Glen v. City of Tyler, 242 F.3d 307, 312 (5th Cir. 2001) (stating that in determining a question of law "the materiality of the factual disputes may be reviewed, but not their genuineness"). Hence, after accepting all of the natural parents' allegations as true, we retain interlocutory jurisdiction to determine as a matter of law whether Lilly and Purdin are entitled to qualified immunity.

Here, all the questions raised by both the social workers and the natural parents pertain to the application of the legal standard of qualified immunity. The central legal issues on appeal are whether the conduct the district court deemed sufficient to support its summary judgment rulings met the standards of "deliberate indifference" and "objective legal reasonableness." As we are addressing conclusions of law, we conclude that the disputes of fact in this case do not deprive us of jurisdiction.

II.     Standard of Review

Ordinarily, we review de novo a district court's denial of summary judgment based on qualified immunity. Spivey v. Robertson, 197 F.3d 772, 774 (5th Cir. 1999). Where, as here, the issue before us is a purely legal one, however, we review the complaint and record to determine whether, assuming as true the facts alleged by the natural parents and determined by the district court

to be in genuine dispute, those facts support a claim for a violation of clearly established law. Finch v. Fort Bend Indep. Sch. Dist., 333 F.3d 555, 562 (5th Cir. 2003).

III.    Qualified Immunity

Lilly and Purdin challenge the district court's denial of their motion for summary judgment based on qualified immunity. The doctrine of qualified immunity seeks to strike a balance between competing social objectives, providing breathing space for the vigorous exercise of official authority, while at the same time allowing a possibility of redress for victims of officials' abuses. Kinney, 367 F.3d at 349 (quoting Butz v. Economou, 438 U.S. 478, 605-06 (1978)) (quotations omitted). Therefore, as a general rule, against claims arising under federal law, government officials acting within their discretionary authority are immune from civil damages if their conduct does not violate clearly established statutory or constitutional law of which a reasonable person would have known. Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982); see also Mendenhall v. Riser, 213 F.3d 226, 230 (5th Cir. 2000).

The qualified immunity analysis is a two-step inquiry. First, a court must decide whether a plaintiff's allegation, if true, establishes a violation of a clearly established right. Hare v. City of Corinth, 135 F.3d 320, 325 (5th Cir. 1998) (en banc). In conducting this initial inquiry, we employ currently applicable constitutional standards. Kinney, 367 F.3d at 350. Second, if the plaintiff has alleged a violation, the court must decide whether the conduct was objectively reasonable in light of clearly established law at the time of the incident. Id. Even if the government official's conduct violates a clearly established right, the official is nonetheless entitled to qualified immunity if his conduct was objectively reasonable. Lukan, 183 F.3d at 346.

7

Although qualified immunity is a two-step analysis, the threshold issue presented by any case arising under Section 1983 is whether a plaintiff has sufficiently alleged a deprivation of a right secured by the Constitution. See Baker v. McCollan, 443 U.S. 137, 140 (1979). It is well-established that Section 1983 does not create substantive rights; rather, it merely provides civil remedies for deprivations of rights established under the Constitution or federal laws. Felton v. Polles, 315 F.3d 470, 479 (5th Cir. 2002) (stating that Section 1983 "is not itself a source of substantive rights; instead, it provides a method for vindicating federal rights elsewhere conferred").

The district court's qualified immunity inquiry began by it finding that the constitutional right at issue in this case is Eric's Substantive Due Process right, as a foster child, to personal security and reasonably safe living conditions. Under step one of qualified immunity, the district court then found such right was "clearly established" based on a "special relationship" between a foster child and the State.[1] Following the Supreme Court's decision in DeShaney v. Winnebago County. Dep't of Soc. Servs., 489 U.S. 189, 195 (1989) and its progeny, the district court stated the law was "clearly established" that "[w]hen a state agency removes a child from the custody of his natural parents and places him under state supervision in the form of [a] licensed foster home, the State stands in a 'special relationship' to that child." Moving to step two of qualified immunity, the district court then found the actions of Lilly and Purdin objectively unreasonable because the summary judgment

---

[1] We note that the district court also alluded to the plaintiffs' stating a theory of liability based on a state-created danger claim. We emphasize that our court has "not yet determined whether a state official has a similar duty to protect individuals from state-created dangers." McClendon, 285 F.3d at 324. In order to recover under the state-created danger theory, we assume that at a minimum, a plaintiff must demonstrate that (1) the state actors created or increased the danger to the plaintiff, and (2) the state actors acted with deliberate indifference. McKinney v. Irving Indep. Sch. Dist., 309 F.3d 308, 314 (5th Cir. 2002). Because we ultimately conclude that a showing of deliberate indifference has not been made, even assuming a theory of liability for state-created danger the plaintiffs would not be entitled to any relief.

evidence demonstrated that each social worker had knowledge of a risk of serious harm to any child placed in the Claud foster home.

On appeal, neither party disputes that Eric suffered a deprivation of a right to personal security, nor does either party challenge the district court's finding of an affirmative duty upon the State, based on a "special relationship", to protect Eric from violence in the Claud foster home. Instead, Lilly and Purdin challenge the district court's rejection of qualified immunity on the basis that the plaintiffs have not alleged facts from which a reasonable jury could conclude that the deprivation of a constitutional right to personal security and reasonably safe living conditions can be ascribed to the acts of Lilly and Purdin. Stated differently, the only issue on appeal is whether the social workers' conduct constituted deliberate indifference.

To demonstrate a viable substantive due process claim, in cases involving government action, the plaintiff must show that the state acted in a manner that "shocks the conscience." County of Sacramento, Et Al. v. Lewis, 523 U.S. 833, 846 (1998). In Lewis, the Court emphasized that although "the touchstone of due process is protection of the individual against arbitrary action of the government," in cases dealing with executive action "only the most egregious official conduct can be said to be arbitrary in the constitutional sense." Id. at 845-46. Consistent with those principles, we have generally required plaintiffs to demonstrate that "the defendant state official at a minimum acted with deliberate indifference toward the plaintiff." McClendon, 305 F.3d at 326. To act with deliberate indifference, a state actor must consciously disregard a known and excessive risk to the victim's health and safety. Farmer v. Brennan, 511 U.S. 825, 837 (1994); see also McClendon, 305 F.3d at 326 n.8.

9

Lilly and Purdin argue t hat the district court erred in attributing to them knowledge of a specific danger that neither social worker actually possessed. Specifically, Lilly and Purdin contend that the plaintiffs cannot show that by placing Eric with the Clauds the social workers had actual knowledge of a specific danger of the particular injury of suffocation. In the alternative, the social workers argue that even if such knowledge existed, Lilly and Purdin are nonetheless entitled to qualified immunity from a deliberate indifference finding because their conduct was objectively reasonable.

The social workers first argue that deliberate indifference requires actual knowledge of suffocation. We cannot agree. Although deliberate indifference is determined by a subjective standard of recklessness, McClendon, 305 F.3d at 326 (finding that a state actor's actual knowledge, rather than what a state actor should have known, is critical to the deliberate indifference inquiry), this court has never required state officials to be warned of a specific danger. Rather, we have held that "the official must be both aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Smith v. Brenoettsy, 158 F.3d 908, 912 (5th Cir. 1998) (quoting Farmer, 511 U.S. at 837). As the Supreme Court has recently reminded us, under a deliberate indifference standard, "we may infer the existence of this subjective state of mind from the fact that the risk of harm is obvious." Hope v. Pelzer, 536 U.S. 730, 738 (2002) (citations omitted and emphasis added). In Hope, the Court similarly rejected the contention "that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful" and stated that the contours of clearly established means that "in the light of pre-existing law the unlawfulness must be apparent." Id. at 740. Here, the social workers do not posit a challenge that a child's right of bodily integrity is "clearly established."

10

Nevertheless, we find that Hope properly illuminates that the district court did not err in rejecting the notion that deliberate indifference requires actual knowledge of suffocation. As applied here, so long as the facts demonstrate that the risk of severe physical abuse to a foster child's bodily integrity is obvious, a showing of deliberate indifference need not teeter on whether the very act of suffocation has been previously held to be unlawful. Stated differently, an obvious showing that state social workers exhibited a conscious disregard for known severe physical abuses in a state-licensed foster home by itself sufficiently demonstrates deliberate indifference to a child's right to personal security.

Moreover, to require state officials to have knowledge of the exact risk of harm, i.e. suffocation, would be inapposite with the Supreme Court's decision in Farmer. In Farmer, the Supreme Court faced the question of what conduct constitutes deliberate indifference when an inmate brings a civil suit against prison officials for prison conditions that violate the Eighth Amendment. 511 U.S. at 837. In rejecting an invitation to adopt an objective test for deliberate indifference, the Court adopted a subjective test where a claimant need not show that a prison official acted or failed to act believing that harm actually would befall an inmate; rather it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm. Id. at 842. In accord with this subjective test, however, a prison official may not escape liability for deliberate indifference by showing that, while he was aware of an obvious and substantial risk to inmate safety, he did not know that the complainant was especially likely to be assaulted by a *specific* prisoner. Id. at 843 (emphasis added). Under the deliberate indifference doctrine, the Supreme Court instructs that we determine whether the state official acting with deliberate indifference exposed a victim to a substantial risk of danger; "it does not matter whether the risk comes from a single source or multiple sources, any more

11

than it matters whether a prisoner faces an excessive risk of attack for reasons personal to him or because all prisoners in his situation face such a risk." Id.

Here, the central inquiry for a determination of deliberate indifference must be whether the state social workers were aware of facts from which the inference could be drawn, that placing children in the Clauds foster home created a substantial risk of danger. We need not address the form that such a risk might eventually manifest. For guidance, we again turn to Farmer, where the Court reasoned that a prison official's awareness that rape crimes are so common in the penal institution that potential victims dare not sleep, "would obviously be irrelevant to liability [on the grounds] that the officials could not guess beforehand precisely who would attack whom." Id. We conclude that such a result is equally compelled where state social workers placed minors in foster homes, despite an awareness of abuse, but seek to avoid liability by contending that they were unaware of the particular type of abuse the children might suffer. Stated differently, as a state official may not escape deliberate indifference liability by arguing that the risk of harm arises from a source not contemplated, a defendant also cannot avoid such liability by contending that the particular method of harm, i.e. how the abuse was carried out, was not envisioned. Hence, we reject the social workers' claim that placing children in the Claud home does not amount to deliberate indifference merely because the State officials failed to perceive the particular risk of suffocation.

Turning to Lilly's and Purdin's second argument, the social workers contend that even assuming they had knowledge of abuse in the Claud home, their conduct fails to constitute deliberate indifference because their acts were objectively reasonable. At the second part of the qualified immunity analysis, "we are only to determine whether, in light of the facts viewed in the light most favorable to the plaintiffs, the conduct of the individual defendants was objectively unreasonable when

12

applied against the deliberate indifference standard." Jacobs v. West Feliciana Sheriff's Dep't, 228 F.3d 388, 394 (5th Cir. 2000).

We begin by emphasizing that our court has interpreted the test of deliberate indifference as a significantly high burden for plaintiffs to overcome. Doe v. Dallas Indep. Sch. Dist., 153 F.3d 211, 218 (5th Cir. 1998). To establish deliberate indifference, the plaintiff must demonstrate culpability beyond mere negligence or even gross negligence. Connor v. Travis County, 209 F.3d 794, 796 (5th Cir. 2000); see Rhyne v. Henderson County, 973 F.2d 386, 392 (5th Cir. 1992) (stating that the basis of § 1983 liability "must amount to an intentional choice, not merely an unintentionally negligent oversight"); see also Taylor, 15 F.3d at 453 n.7 (distinguishing "deliberate indifference" from "gross negligence" by noting that "the former is a 'heightened degree of negligence,' [whereas] the latter is a lesser form of intent") (citations omitted). Here, for the natural parents to overcome the deliberate indifference standard they must demonstrate that the social workers knew of the underlying facts indicating a sufficiently substantial danger and that the social workers did not believe that the risks to which the facts gave rise was insubstantial or nonexistent. Rosa H v. San Elizario Indep. Sch. Dist., 106 F.3d 648, 659 (5th Cir. 1997) (quotations and citations omitted). Because neither party disputes that the social workers knew of allegations of abuse in the Clauds' home prior to Eric's placement there, to prevail on summary judgment the natural parents must demonstrate the existence of a disputed fact, that the state officials violated "the right of a child in state custody not to be handed over by state officials to a foster parent . . . *whom the state knows or suspects to be a child abuser*." Morgan, 914 F.2d at 852 (emphasis in original). In ascertaining whether the social workers acts sufficiently raise a genuine issue of material fact issue for subjective deliberate indifference, we

13

examine the culpability of each social worker separately. Stewart v. Murphy, 174 F.3d 530, 537 (5th Cir. 1999).

a.      Lilly's Conduct

The natural parents allege that Lilly was deliberately indifferent because prior to the foster placement of Eric, she failed to make a full investigation into complaints of abuse at the Claud home. We are not persuaded.

This court has previously held that actions and decisions by officials that are merely inept, erroneous, ineffective, or negligent do not amount to deliberate indifference and do not divest officials of qualified immunity. Alton v. Texas A.&M Univ., 168 F.3d 196, 201 (5th Cir. 1999). As a CPS Investigator, Lilly had the obligation to visit the Claud home and determine if any member of the Claud family had physically abused any child in their care. Here, the record shows that Lilly knew of two physical abuse complaints involving the Clauds, prior to the death of young Eric: a January 19, 1999, allegation of a three-year-old foster child with bruises and a January 28, 1999, allegation of four foster children locked in a closet while Mrs. Claud worked on crafts.

However, we do not find that Lilly merely turned a blind eye to these allegations because the summary judgment record shows that Lilly conducted unannounced investigations into both complaints. In response to the January 19, 1999 referral, Lilly took care to spend time in the foster home to observe the interaction between the foster children and members of the household in order to determine whether any child had been physically abused in the Claud home. During this first investigation of bruises on two foster children, Lilly interviewed the children in the household, the Clauds, the Claud's fourteen-year-old son, and other TDPRS specialists who had children placed in the Claud home. Lilly's investigation also included an unannounced visit to the Claud home in the

14

early morning. On her second investigation of a January 28, 1999, report of children being locked in closets, Lilly again arrived at the Claud home unannounced and spent no less than three hours interviewing the children, the Clauds, their baby sitter, and the TDPRS Specialists, and concluded that the allegations of abuse could not be sustained. In this second investigation, Lilly observed among other things that none of the closets had locks, and thus it was highly unlikely that "the locking children in a closet" allegation was true. Again, Lilly concluded that the allegation of abuse could not be sustained.

Following Alton, the natural parents cannot prevail on summary judgment merely because Lilly might have learned of more damaging information if she had conducted a more thorough inquiry of the Clauds. Determining whether Lilly adequately or diligently performed her investigation such that Eric's death might have been prevented certainly raises questions of negligence. While Lilly may arguably have been negligent in conducting an incomplete background investigation of the Clauds prior to placing Eric in the Clauds' foster home, the very high standard of deliberate indifference cannot be inferred from negligence alone. Hare v. City of Corinth, 74 F.3d 633, 649 (5th Cir. 1996) (en banc). We therefore disagree with the district court's determination that Lilly's actions constituted deliberate indifference. Accordingly, we conclude that Lilly is entitled to qualified immunity.

b. Purdin's Conduct

The natural parents allege that Purdin was deliberately indifferent because she pressured Lilly to terminate her investigation and she placed Eric with the Clauds notwithstanding her knowledge of physical abuse at the Claud home. We cannot agree. After reviewing the summary judgment record, it is clear that Purdin was employed by a separate department within the agency and exercised

15

no authority over Lilly. The record is devoid of any independent evidence to support this claim, hence we cannot conclude that Purdin "pressured" Lilly into terminating her investigation early.

Nevertheless, the natural parents also argue that Purdin was deliberately indifferent for placing Eric with the Clauds in light of her prior awareness of a bruise on a child placed in the Claud home. As the Court emphasized in Farmer, a state official will be denied qualified immunity "if the evidence showed that [she] merely refused to verify underlying facts that [she] strongly suspected to be true, or declined to confirm inferences of risk that he strongly suspected to exist." 511 U.S. at 843 n.8. Because we cannot conclude that this standard has been met, we again reject the natural parents' claim.

As a CPS Placement Worker, Purdin was responsible for managing the foster children in the care of the Clauds; conducting quarterly visits with the family; assessing and matching foster families, like the Clauds, with children; and monitoring these foster homes for compliance with CPS's minimum standards. According to CPS policy, children may not be placed in homes which are under investigation for abuse.

The record reveals that Purdin was aware of two complaints of possible abuse in the Claud home prior to the death of young Eric. On one occasion, Purdin was informed by social worker Patty Zukas that Mrs. Claud brought one of her foster children to CPS with a swollen, red jaw. Mrs. Claud offered in explanation that the child "just woke up with it this morning." In response to Zukas's report, Purdin did nothing. On a separate occasion, Purdin was aware of an anonymous phone call alleging that Mrs. Claud was locking children in a closet as a means of discipline. The record shows that Purdin contacted a CPS Investigator regarding the second complaint, but not the first.

16

Similar to Lilly, Purdin knew of two allegations concerning abuse in the Claud home, but Purdin is alleged to have been deliberately indifferent toward Eric because she failed to act based on that knowledge. Purdin visited the Claud home no less than eight times in the course of her two year supervision of the home. Based on her personal observations and experience, she concluded that there was no substantial danger of harm to children placed there.

With regards to the locking children in a closet incident, we cannot find Purdin deliberately indifferent when she contacted CPS Investigator Lilly and inquired into the progress of Lilly's investigation. As to the other incident of CPS worker Zukas noticing a bruise on a child under the Clauds' care, the summary judgment record before us does not demonstrate that the bruised child sustained any severe injury. Also, Purdin reasonably believed that the bruise was consistent with Mrs. Claud's statement that the bruise was sustained when the child accidentally fell out of his crib. Additionally, the record demonstrates that the bruised child's social worker never complained or expressed any concerns about the incident nor did Purdin even have the name of the child to follow up on. Hence, while the quality of state agency supervision over the care giving offered by the Clauds appears highly questionable, at best the plaintiffs have made out a case of negligence on the part of the state social workers. Based on these facts, we cannot conclude that evidence of a slight bruise on a cheek, without more, is sufficient for the plaintiffs to overcome our circuit's high burden of demonstrating deliberate indifference. We therefore find that Purdin is entitled to qualified immunity.

IV.     Official Immunity

We have jurisdiction to review the denial of official immunity because Texas's official immunity doctrine, like the federal doctrine, relieves state officials of the burden of suit and liability for damages. Roe v. Tex. Dep't. of Protective & Regulatory Servs., 299 F.3d 395, 413 (5th Cir.

17

2002). Lilly and Purdin contend that the natural parents failed to show both that they acted in bad faith and that no reasonable official would have placed an infant in the Claud home in light of the allegations of abuse. We agree.

Under Texas law, government officials are entitled to immunity from suit arising under performance of their (1) discretionary duties in (2) good faith as long as they are (3) acting within the scope of their authority. Austin v. Johnson, 328 F.3d 204, 211 (5th Cir. 2003); see also City of Lancaster v. Chambers, 883 S.W.2d 650, 653 (Tex. 1994). The good faith element is "substantially" the same as the federal inquiry of qualified immunity; to determine "good faith" we ask whether a reasonably prudent official could have believed his or her conduct was consistent with the plaintiffs' rights. Cantu v. Rocha, 77 F.3d 795, 809 (5th Cir. 1996). Determining official immunity under state law is distinct from the federal test of qualified immunity because the former focuses solely on the objective legal reasonableness rather than the clearly established inquiry. Id. Accordingly, whether Lilly and Purdin are entitled to immunity on any of the state law claims depends solely on whether their actions were objectively reasonable.

Here, the plaintiffs allege state law claims based on negligence. Drawing all inferences in favor of the natural parents, we find that because the social workers' acted with "objective legal reasonableness" to Eric's safety they are entitled to official immunity for the negligence claims. The summary judgment record does not show that Purdin "pressured" Lilly to abandon her investigation of the Claud home. As previously mentioned, as a placement officer Purdin had no direct supervisory authority over Lilly's role as a CPS investigator.

Moreover, the summary judgment evidence shows that prior to placing Eric in the Clauds' foster home, Purdin investigated allegations of the Clauds using a device to lock children in the closet

18

and Mrs. Claud agreed to no longer use the device. Purdin also reasonably believed that the child with the swollen jaw sustained his injury when he accidentally fell out of the crib, and not by any act of abuse.

Similarly, the summary judgment evidence, for the reasons previously mentioned, demonstrates that Lilly conducted investigations into both the January 19, 1999, and January 28, 1999, allegations of child abuse at the Clauds' home. On each occasion, Lilly conducted home visits to the Claud home, interviewed the Clauds and the children, and in her expertise as a CPS social worker ruled out abuse. In short, the plaintiffs have failed to present any evidence that demonstrates that no reasonable social worker would have acted as Lilly and Purdin did under similar circumstances. Hence, a jury could not reasonably conclude that the social workers investigation into allegations of abuse constitutes unreasonable conduct or a failure to perform their official duties. We, therefore, conclude that the district court erred in denying the social workers the defense of official immunity to the plaintiffs state law claims.

## CONCLUSION

For the foregoing reasons, we reverse the district court's denial of summary judgment, and remand this case to the district court with instructions to enter a judgment in favor of social workers Lilly and Purdin, granting them qualified immunity and official immunity. REVERSED and REMANDED.