JAMES E. GRAVES, JR., Circuit Judge,
joined by DENNIS, SOUTHWICK, and COSTA, Circuit Judges, dissenting:
The question in this case is whether there is sufficient evidence supporting the jury’s verdict that prison guard Sharon Hampton was deliberately indifferent when she knowingly took multiple actions that created an obvious and substantial risk of attack and injury to the inmates she was charged with protecting. Were the majority the jury in this case, I would likely conclude that there was sufficient evidence to support its verdict. But because we are prohibited from substituting our own fact-finding for that of the jury, I would affirm the decision of the district court.
I.
This is a fact-bound case in which we are called upon to review the sufficiency of the evidence supporting a jury finding of deliberate indifference under the Eighth Amendment. We review the district court’s denial of a motion for judgment as a matter of law de novo. Thomas v. Tex. Dept. of Criminal Justice, 220 F.3d 389, 392 (5th Cir.2000). “We accord great deference to the jury’s verdict when evaluating the sufficiency of the evidence, viewing all the evidence and drawing all reasonable inferences in the light most favorable to the verdict.” Id. A motion for judgment as a matter of law should be granted only when “the facts and inferences point so strongly in favor of the movant that a rational jury could not reach a contrary verdict.” Id. (quoting Waymire v. Harris County, Texas, 86 F.3d 424, 427 (5th Cir.1996)). “If there is substantial evidence of such quality and weight that reasonable and fair-minded men in the exercise of *300 impartial judgment might reach different conclusions, the motion should be denied.” Cantu v. Jones, 293 F.3d 839, 844 (5th Cir.2002) (internal alterations and quotation omitted).
There is no argument on appeal that the jury heard evidence it should not have heard or that any relevant evidence was excluded. There is no dispute that the jury was properly instructed about deliberate indifference and causation, as well as general principles such as direct and circumstantial evidence, credibility of witnesses, and the standard of proof. The district court reviewed1 all the evidence carefully at every stage of the case, eventually granting judgment as a matter of law to the second defendant on trial, George Davenport, while allowing the claim against Hampton to go to the jury. Post-verdict, the district court again carefully reviewed the evidence of deliberate indifference in denying Hampton’s renewed motion for judgment as a matter of law. In reviewing the evidence of Hampton’s acts and omissions, the district court concluded:
Christopher Epps, Commissioner of the Department of Corrections, testified that on July 25, 2007, the date in question, Unit 32 was a dangerous place. Based on an investigation prompted by MDOC, Hampton was suspended for ten days for leaving the inmates on the yard beyond the allowable time, handing off an unloaded block gun on the yard, and taking the ammunition when she went inside the building after handing off the gun. Hampton acknowledged that on July 25, 2007, she did not inspect the pens, assumed the block gun was already loaded, and made a mistake in not checking the gun for ammunition. Larry Haefeli, Plaintiffs’ witness designated as a correctional practice and standards expert, opined that Hampton’s failure to inspect the pens on the day in question was a violation of ACA Standards, the MDOC post order, and the standard of care. Moreover, Haefeli testified that Hampton’s violations amounted to deliberate indifference to the safety of Plaintiffs and was a contributing cause of Reed’s death and the others’ injuries.
The court then concluded that “Taking the facts in the light most favorable to the non-moving party, the jury had a legally sufficient evidentiary basis to find for the Plaintiffs.” Because I agree with the district court, I would affirm.
A.
Hampton first argues, and the majority agrees, that there was insufficient evidence that she was deliberately indifferent. Hampton argues that there is insufficient evidence to support the jury’s1 verdict that by failing to check if the block gun was loaded and knowingly taking the ammunition for the gun with her and leaving an improperly armed guard on the yard, she disregarded a substantial risk of harm to the inmates. She argues that, at most, she was negligent. Hampton also argues that the risk of harm from inmate attacks at Unit 32 was too- generalized to have alerted her to the risk of leaving Taylor without the additional ammunition when she left the yard.
“It is well established that prison officials have a constitutional duty to protect prisoners from violence at the hands of their fellow inmates.” Longoria v. Texas, 473 F.3d 586, 592 (5th Cir.2006); see Farmer v. Brennan, 511 U.S. 825, 832-33, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). “Having incarcerated persons with demonstrated proclivities for antisocial criminal, and often violent, conduct, and having stripped them of virtually every means of self-protection and foreclosed their access to outside aid, the government and its *301 officials are not free to let the state of nature take its course.” Farmer, 511 U.S. at 834, 114 S.Ct. 1970 (internal alterations, quotations and citations omitted). To prevail on their claims against Hampton, Plaintiffs were required to demonstrate two things: that they were “incarcerated under conditions posing a substantial risk of serious harm,” and that Hampton was deliberately indifferent to that risk. Id.
A prison official is deliberately indifferent when “the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.” Id. at 837, 114 S.Ct. 1970. Deliberate indifference thus requires the official’s subjective awareness of risk; it is not enough that a reasonable official should have known of the risk. See id. at 837-38, 114 S.Ct. 1970. However, “[wjhether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence” or “from the very fact that the risk was obvious.” Id. at 842, 114 S.Ct. 1970. With regard to inmate-on-inmate attacks, Farmer specifically holds that if a substantial risk of inmate-on-inmate attacks was “longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus ‘must have known’ about it,” then a jury could reasonably conclude that the official “had actual knowledge of the risk.” Id. at 842-43, 114 S.Ct. 1970 (quotation omitted).
The evidence presented at trial was more than sufficient for a reasonable jury to find that Hampton knew that leaving an under-armed guard on the yard created a substantial and obvious risk of inmate-on-inmate attacks and that Hampton deliberately disregarded that risk when she decided to do it anyway. The evidence es--tablishes that Unit 32 was not a typical unit in a typical prison, but was designated to hold some of the most dangerous inmates in the Mississippi prison system, including rival gang members, inmates that were too violent to be in the general population, and inmates who had committed serious rule violations. Then-MDOC Commissioner Christopher Epps testified and described a culture of pervasive violence arid even employee corruption, and an environment in Unit 32 where weapons were readily available, fighting and stabbing were frequent and murders were not uncommon. Epps testified that the pens were constructed specifically because of the prevalence of fighting and stabbings in the yard. He testified that it was known that inmates made weapons out of anything, including making shanks out of the pens themselves, and that officials knew of the possibility that inmates had placed weapons in their pens, or even that guards had placed weapons there for the inmates. Epps also testified that less than a month prior to the incident, a guard affiliated with a gang had smuggled a gun to inmates insidé Unit 32, which was to be used to kill rival gang members, further highlighting the pervasive danger of inmate-on-inmate violence in Unit 32. He testified that this previous incident “contributes, in my professional opinion, to this — why we’re here today.” Epps told the jury that “the facts are, gang in, gang out, blood in, blood out. When you join, you join knowing that your life is put on the line. And the facts are, we can blow all of the hype for the jury and make all the nice statements and speeches, but at the end of the day, the incident was going to happen either on the pens or somewhere else.”
*302 Additional evidence described the explosive conditions at Unit 32 and further supported Epps’ testimony regarding the known substantial risk of inmate-on-inmate violence. Ricky Scott, a gang specialist for MDOC, testified that Reed, Williams, and Bynum had been attacked pursuant to an ongoing “war” between rival gangs, and that inmates would try “to beat the security whichever way they can” in order to attack other inmates. Lawrence Haefeli, Plaintiffs’ expert in corrections, explained several specific factors that gave rise to a particularly dangerous situation in Unit 32 at the time of the incident, including that the unit housed gang members, inmates too violent to be in the general population, and mentally ill inmates, and that the prison’s classification system, which did not allow inmates to work their way out of segregation, created a “desperate” situation for inmates.
This evidence, including testimony from the Commissioner of the Department, portrays a brutal and violent unit where the substantial risk of inmate-on-inmate violence, especially in the yard, was “longstanding, pervasive, [and] well-documented,” and was particularly heightened around the time of the attack on the Plaintiffs. The jury could reasonably have concluded that Hampton must have been aware of the risk of attacks in the yard. Farmer, 511 U.S. at 842-43, 114 S.Ct. 1970.
The majority asserts that the jury could not impute Epps’ knowledge of the exceedingly violent and explosive nature of Unit 32, including past violent incidents in the yard, to Hampton, an eight-year veteran of MDOC. The majority substitutes its own judgment for that of the jury. The majority apparently would conclude that only Hampton’s acknowledgment that she was aware of a substantial risk would suffice. Yet it is clear that direct evidence regarding Hampton’s subjective state of mind is not required, so long as the risk was sufficiently obvious. Farmer, 511 U.S. at 842, 114 S.Ct. 1970. Further, Farmer provides that, even if there is sufficient evidence that a risk was obvious, “it remains open to the officials to prove that they were unaware even of an obvious risk to inmate health or safety.” Id. at 844, 114 S.Ct. 1970. Thus, Hampton could have produced evidence that even though the risk of inmate-on-inmate attacks on the yard was obvious, she was in fact not subjectively aware of it. She did not. The evidence that was presented was more than sufficient to allow the jury to find that the risk was obvious and that an experienced guard working in the unit must have known of it.
The evidence further shows that Hampton consciously and knowingly made multiple decisions that disregarded the obvious risk of harm from inmate-on-inmate attacks on the yard at Unit 32. It is undisputed that Hampton never checked that the block gun was loaded after she received it from Taylor, despite evidence showing that it was her duty to check the gun upon receiving it, and despite being the officer on duty in the yard for multiple hours that day. It was a disputed question whether Hampton could or should have checked the gun during yard call, but resolution of that dispute is a quintessential jury question. It is undisputed that Hampton decided to go inside to retrieve a form for an inmate who said he would not leave the yard unless she did. It is undisputed that Hampton knowingly took the two additional rounds of ammunition inside with her, although she knew that prison policy required her to leave them with Taylor when she gave him the block gun. Hampton testified that “I handed Lieutenant Taylor the gun and the keys, and thinking that I’m going to come back out in less than a minute or two, I took the rounds with me.” She did not simply for *303 get about the ammunition; she thought about her actions and decided to do it anyway, knowingly leaving an under-armed guard on the yard. Although Hampton testified that she intended to be inside for “less than a minute or two,” she was actually gone for at least five to six minutes, when the attack began and she was still inside with the ammunition. In a situation as volatile as the one that existed in Unit 32 at the time, with a past history of serious inmate violence in the yard, the jury was entitled to find that knowingly leaving a guard without sufficient ammunition, and thus without the necessary means to keep order and defend himself or other inmates, was deliberately indifferent to an obvious risk of harm.
In addition, Plaintiffs’ expert in corrections testified to his conclusion that Hampton’s actions both violated the correctional standards followed by MDOC and amounted to deliberate indifference. The majority’s discussion of whether the expert’s opinion alone could create a fact issue is utterly irrelevant to this case; Haefeli’s expert opinion was one piece of evidence among others that allowed the jury to reach the verdict that it did. Haefeli testified that his opinion was based on documents and evidence related to the incident, including MDOC’s internal investigative report, post orders for officers at Unit 32, Defendants’ discovery responses, Epps’ deposition and trial testimony, Davenport’s deposition and trial testimony, and Hampton’s own deposition and trial testimony, which he referenced and explained to the jury, including explaining how Hampton’s actions deviated from the post order for yard officers and how her own admitted failures 'violated correctional standards. See Wackman v. Rubsamen, 602 F.3d 391, 400 (5th Cir.2010) (“An expert’s opinion must be supported to provide substantial evidence; we look to the basis of the expert’s opinion, and not the bare opinion alone.” (quotation omitted)). Haefeli’s ultimate conclusion that Hampton was deliberately indifferent was based, in part, on Hampton’s own deposition testimony that she knew the ammunition was important because, absent ammunition for the block gun, there was no way to protect the inmates or other officers from an attack. Though the expert was permitted to testify to the ultimate issue of deliberate indifference — without objection from Hampton — it was not necessary for him to do so in order to create a fact issue for the jury regarding Hampton’s deliberate indifference.
Further, Hampton was disciplined and suspended for ten days because her failing to check the block gun and taking the ammunition inside with her constituted rule violations involving a threat to human life or safety. While the discipline standing alone could not be dispositive proof that Hampton was deliberately indifferent, Hampton’s failure to follow protocols put in place for the safety of guards and inmates is certainly a relevant fact that the jury was -entitled to take into account. Of course, not every mistake or protocol violation by a prison guard becomes deliberate indifference simply because prisons are dangerous. If an officer acts or responds reasonably in a situation involving a risk of inmate-on-inmate attack, there will be no liability, even if the harm is not averted. Farmer, 511 U.S. at 844, 114 S.Ct. 1970. Even if an officer acts without the due care a reasonable person would use, such that the officer is only negligent, there will be no liability. See Davidson v. Cannon, 474 U.S. 344, 347, 106 S.Ct. 668, 88 L.Ed.2d 677 (1986).
Here, the record is replete with evidence allowing the jury to find that leaving Taylor with insufficient ammunition created a substantial and obvious risk of inmate-on-inmate violence in the yard, and that *304 Hampton knowingly took several actions that showed deliberate disregard of that risk.
B.
Hampton argues, essentially, that the jury could not find that she was aware of a risk of harm unless an identical incident in which inmates broke out of their pens had previously occurred. But Farmer makes clear that a prison official need not anticipate the specific way an attack will unfold in order for that risk to be substantial enough to incur liability. Farmer provides:
Nor may a prison official escape liability for deliberate indifference by showing that, while he was aware of an obvious, substantial risk to inmate safety, he did not know that the complainant was especially likely to be assaulted by the specific prisoner who eventually committed the assault. The question under the Eighth Amendment is whether prison officials, acting with deliberate indifference, exposed a prisoner to a sufficiently substantial “risk of serious damage to his future health,” and it does not matter whether the risk comes from a single source or multiple sources, any more than it matters whether a prisoner faces an excessive risk of attack for reasons personal to him or because all prisoners in his situation face such a risk.
Farmer, 511 U.S. at 843, 114 S.Ct. 1970. For example, in Cantu v. Jones, we upheld a jury verdict of deliberate indifference against defendant prison officials, even though the case “involve[d] an extraordinary set of circumstances” that led to inmates attacking other inmates. 293 F.3d at 844-45.
Similarly, in Hernandez ex rel. Hernandez v. Texas Department of Protective & Regulatory Services, a due process case, we held that “[although deliberate indifference is determined by a subjective standard of recklessness, this court has never required state officials to be warned of a specific danger.” 380 F.3d 872, 881 (5th Cir.2004) (internal citation omitted). In Hernandez, the defendant government officials argued that they could not be held liable for the suffocation of a child in foster care, because there was no evidence that they had actual knowledge that placing the child with the foster parents entailed a “specific danger of the particular injury of suffocation” and “deliberate indifference requires actual knowledge of suffocation.” Id. We rejected that argument, and explained that to hold otherwise “would be inapposite with” Farmer. Id. at 881-82. Instead, we held that “the central inquiry” was “whether the state social workers were aware of facts from which the inference could be drawn, that placing children in the ... foster home created a substantial risk of danger. We need not address the form that such a risk might eventually manifest.” Id. at 882. We concluded that “a state official may not escape deliberate indifference liability ... by contending that the particular method of harm, i.e. how the abuse was carried out, was not envisioned.” Id.; see also Tafoya v. Salazar, 516 F.3d 912, 916 (10th Cir.2008) (“The official’s knowledge of the risk need not be knowledge of a substantial risk to a particular inmate, or knowledge of the particular manner in which injury might occur.”); Haley v. Gross, 86 F.3d 630, 643 n. 33 (7th Cir.1996) (“Sergeant Ellis and Superintendent Gross are no less liable for deliberate indifference because, while they knew that Wilborn presented a substantial risk of serious harm to Haley, they may not have envisioned that Wilborn would light the cell on fire.”).
The evidence was sufficient for the jury to find that leaving insufficient ammunition for Taylor to use in the event of a security *305 breach created a substantial and obvious risk of harm from inmates attacking other inmates in the yard. The Plaintiffs were not required to show that Hampton knew precisely how such an attack might unfold.
C.
In addition, although the focus of this appeal has become Hampton’s actions with regard to the two rubber bullets for the block gun, the jury actually heard evidence regarding additional failures by Hampton which the jury could have found constituted deliberate indifference. The district court expressly relied on this evidence in denying judgment as a matter of law. Specifically, at trial, the Plaintiffs produced evidence that it was Hampton’s duty as yard officer to inspect the pens, and that she did not. While Hampton and Epps vehemently contested whether it was Hampton’s duty to inspect the pens that day, the Plaintiffs presented evidence that would support a finding that it was. Plaintiffs presented a “post order,” which is a description of duties, for yard officers, which provided that yard officers should inspect the pens before an inmate is placed inside. Hampton testified that her post that day was as the yard officer, and that “My job was to go around the pens to make sure that [sic] wasn’t nothing going on.” Epps testified that “Normally, your pens is inspected by the individual who is out maintaining security at the pens,” which implies that it was Hampton’s job as the yard officer to do the inspection. Epps testified that it was known that inmates made weapons out of the pens, or had weapons placed inside the pens by someone else. Indeed, multiple perpetrators of the attack were able to acquire weapons by storing them in the pens or having them placed in their pens by someone else. Inmate Hayes testified that there were “weapons waiting on me” in the pen and that he knew the guards did not check the pen before he was placed inside it. Inmate House testified that he also had weapons waiting in his pen, placed there by other inmates the day before.
Thus, there was evidence that the jury could have believed that it was Hampton’s duty to inspect the pens, and that she faded to do so, which was deliberately indifferent to an obvious risk that the inmates might smuggle weapons into the pens or use something in the pen as a weapon against other inmates. This type of evidentiary dispute is unquestionably for the jury to resolve.
II.
Hampton also argues that there is insufficient evidence supporting the conclusion that her actions were the cause of Plaintiffs’ injuries. She argues that Taylor’s failure to fire the block gun and his dropping the keys to the pens were the only causes of the harm to the Plaintiffs.
“We begin with the obvious proposition that the question of causation is ‘intensely factual.’ ” Morris v. Dearborne, 181 F.3d 657, 673 (5th Cir.1999) (quoting Savidge v. Fincannon, 836 F.2d 898, 905 (5th Cir.1988)). We have held that the proximate causation requirement in § 1983 cases is satisfied with proof that the defendant “set in motion events that would foreseeably cause the deprivation of Plaintiffs’ constitutional rights.” Id. at 672.
This jury was not armed with the law of causation that is now being applied by the concurring opinion. With regard to causation, the jury was instructed only that:
[T]he Plaintiffs have the burden to identify the Defendant or Defendants who are either personally involved in the constitutional violation or whose acts are causally connected to the constitutional violation alleged.
*306 If you find that Defendant Sharon Hampton had no personal or direct involvement, or was not causally connected to the incident, then you should return a verdict for the Defendant Sharon Hampton.
Hampton proposed this instruction. The jury was not instructed on actual causation, proximate causation or supervening causes. Hampton never proposed any such instruction and has never argued that the jury instructions were deficient. Nor did Hampton assert causation as a basis for judgment as a matter of law at any time before submission of the case to the jury.
Hence, there was sufficient evidence to support the jury’s finding that Hampton’s actions were causally connected to the Plaintiffs’ injuries. The evidence is clear that, at first, only two inmates escaped, and there is undisputed testimony from both Williams and Bynum that the two escaped inmates stopped when Taylor pointed the gun at them. They only continued to advance after he lowered the gun and instead retreated. While there is not clear evidence of Taylor’s reasons for retreating,[77] it is an obvious inference that he knew or realized that Hampton had not handed him the bullets when she handed him the gun. Taylor may have assumed the gun was loaded but realized that he had no extra ammunition, leaving him with at most one round to stop two armed inmates. It is a logical inference that if he had the additional rounds — that is, the number of rounds the Department had determined is adequate to keep with the block gun — he might have been able to dissuade the inmates from continuing with their attack or to hold them at bay until he could radio for additional officers to assist. The Plaintiffs’ expert at trial testified that Hampton’s' failure to provide ammunition for the block gun and failure to inspect the pens were contributing causes of the Plaintiffs’ injuries. Further, while Hampton might not have anticipated that Taylor would specifically drop the keys, Taylor’s panic and inability to control the situation are the natural and probable consequences of leaving an insufficiently-armed guard on the yard. Taylor dropping the keys is not an independent, unforeseeable event that breaks the chain of causation, but the result of the out-of-eontrol situation that predictably resulted from Hampton effectively disabling the primary tool at the guard’s disposal to control the yard.
These are all inferences from the evidence that are within the province of the jury to make, particularly given the abbreviated guidance the jury received on the causation issue. There is no basis to reverse the jury verdict that Hampton’s deliberate indifference caused the injuries to the Plaintiffs.
III.
Lastly, I note that this is not a qualified immunity case. Hampton pleaded the affirmative defense of qualified immunity in her answer, but she never moved for summary judgment based on qualified immunity, she did not mention qualified immunity in her motion for judgment as a matter of law, and she made only thinly-briefed arguments regarding qualified immunity in her initial panel briefs. She did not even mention qualified immunity in her supple *307 mental en banc brief. Thus, qualified immunity could not be grounds for reversal.
IV.
This case comes to us on appeal after a jury verdict and involves fact-intensive issues. After hearing the evidence of multiple failures by Hampton, and the obvious risk of inmate-on-inmate attacks at Unit 32, a reasonable juror could have found that Hampton’s actions were deliberately indifferent to a substantial risk of harm and caused the Plaintiffs’ injuries. The district court’s decision that the jury verdict is compatible with the law and the evidence in the record should be affirmed. I therefore dissent.

. The concurring opinion points to Taylor’s unsigned statement to MDOC investigators that "not knowing how many inmates were out, I decided to run inside the building” as evidence of the reason for Taylor's flight. When asked to swear that it was the truth, Taylor specifically refused to sign the statement during the investigation. Taylor was subsequently disciplined for making false statements during the investigation.