WIENER, Circuit Judge,
joined by DENNIS, Circuit Judge,
dissenting:
Like the law of nature, the law of man recognizes no more basic or extensive “special relationship” than that between parents and their “very young” children. Central to that relationship is the parents’ exclusive right to the custody of their children and the concomitant duty to protect them. It must follow that when a state mandates that parents delegate the custody of their child to a state agency, subdivision, or municipality, such total delegation creates a special relationship between the delegatee and the child in its custody — at least when such child is “very young”— and imposes on such custodial state delegatee a duty to protect that child from violations of her constitutional rights. I am convinced that the parents’ custodial delegatee here — the Covington County Elementary School (“the School”) — cannot be permitted to evade its duty to protect its very young pupils while they are in its exclusive custody.
As is apparent from the Does’ Iqbal/Twombly-compliant[1] complaint and the majority opinion, this case involves repeated decisions and acts by the School’s officials to temporarily sub-delegate its exclusive custody of a nine-year-old fourth-grade girl, in the middle of six different school days, over a span of four months, to *876 an unidentified adult, who was not authorized under the School’s express policy to check her out, and whose identity it did not even attempt to verify. On each of those six occasions, that adult, Tommy Keyes, proceeded to brutally rape the little girl, Jane Doe, and then return her to the custody of the School — still during the course of the school day. This was no isolated or anecdotal incident, and the School’s officials allegedly contributed to its recurrence by failing, each time, to verify Keyes’s identity and his lack of authorization.
Despite our standard of review of dismissal of actions at their initial (Rule 12(b)(6)) stage, the majority raises the stakes of this appeal by not limiting its analysis to the Does’ complaint, but instead asserting categorically that public schools have no DeShaney special relationship[2] with, and thus no constitutional duty to protect, any schoolchildren — not even the very young — from non-state actors. Thus, I address (1) whether a public school can ever have a constitutional duty to protect any subset of children in its care, (2) whether the Does adequately pleaded facts that would support such a duty, and (3) whether School officials violated that duty through their deliberate indifference to Jane’s constitutional rights. Ultimately, I answer these questions in the affirmative. Assuming, as we must at this initial, pleadings stage of the proceedings, that the factual allegations of the Does’ complaint are correct, I conclude that the School’s actions constitute a serious derogation of the State’s constitutional duty to protect a helpless individual while in its exclusive custody and care. Because I remain convinced that the majority’s conclusion that the State had no such constitutional duty is contrary to both law and common sense, I respectfully but strenuously dissent.
I. SPECIAL RELATIONSHIP
The substantive component of the Due Process Clause of the Fourteenth Amendment protects individuals from state action that “shocks the conscience.”[3] Although substantive Due Process does not generally protect individuals from private actors, the Supreme Court stated in DeShaney that there is an exception, and that the State does owe an individual a duty of protection when a special relationship exists between the State and the individual:
[WJhen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being .... The rationale for this principle is simple enough: when the State by the affirmative exercise of its power so restrains an individual’s liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs — e.g., food, clothing, shelter, medical care, and reasonable safety — it transgresses the substantive limits on state action set by the Eighth Amendment and the Due Process Clause.[4]
In this case, Jane attended a public elementary school in Mississippi, where attendance is compulsory[5] and where all the *877 relevant events took place during the school day, not at its end.[6] None disputes that more than compulsory public education is required to establish a special relationship between the State and a student, but this does not justify taking the leap of logic needed to reach the conclusion that a special relationship can never exist in the public school setting. When, in Doe v. Hillsboro Independent School District, we held that alone compulsory attendance does not create a special relationship between a state and a presumably pubescent, thirteen-year-old middle-school student, we quoted the following general explanation from the Supreme Court’s decision in Ingraham v. Wright as to why public schools are distinguishable from, e.g., prisons and mental institutions:
Though attendance may not always be voluntary, the public school remains an open institution. Except perhaps when very young, the child is not physically restrained from leaving school during school hours; and at the end of the school day, the child is invariably free to return home. Even while at school, the child brings with him the support of family and friends and is rarely apart from teachers and other pupils who may witness and protest' any instances of mistreatment.[7]
Ingraham’s latent exception for the “very young” public school attendee is finally before us, in the Does’ complaint, for the first time.
The majority attempts to distinguish Ingraham based on that case’s concern with the application of the Eighth Amendment to corporal punishment in public schools, but our decision in Hillsboro expressly recognized the obvious relevance of Ingraham’s analysis to the special relationship inquiry. Compounding the majority opinion’s error in making this purported distinction, it strangely declares that the Supreme Court’s reasoning does “not suggest that a public school is no less an open institution if a student is restrained from freely leaving the school due to her young age or if a student is apart from teachers or other students, whether on campus or off.”[8] In fact, though, that is precisely what the Supreme Court’s analysis suggests.
Specifically, the Ingraham exception can only mean that there may very well be a special relationship between a public school and a student who (1) is “very young,” (2) is “physically restrained” by (and unable to leave freely) the school’s custody, and (3) is isolated or kept “apart from teachers and other pupils who may witness and protest any instances of mistreatment” — as is precisely alleged here. Rather than superficially distinguishing what the Supreme Court has said — even in dicta — we should apply it, as I shall now attempt to do.

A. Jane Was of Such a Very Young Age That She Could Not Protect Herself

When Jane was repeatedly checked out of school and brutally raped, she was a very young, pre-pubescent, nine-year-old, fourth-grade girl. The majority refuses to acknowledge the obvious: that the degree of control exercised by a de jure and de facto custodian over very young children is *878 necessarily much greater and more pervasive than over post-puberty teenagers or adults. The majority does not even acknowledge that the Does might be able to establish as much if given the opportunity to adduce evidence, especially expert reports and testimony. But expert testimony is not required to know that very young children like Jane are virtually never capable of protesting or challenging adult authority figures, particularly those whose authority is apparently endorsed by the very persons or institutions that such children trust.[9] Neither are such youngsters generally able to recognize and respond to subtle threats to their safety, which is the prime reason why they, unlike older students, are never permitted to leave school grounds by themselves. The defendants in this case do not assert that the School had a unique policy of allowing very young, fourth-grade students to come and go without restraint; indeed, the School’s adoption of a formal check-out policy confirms that just the opposite is true. Add to this truism the two-step factual allegations of the Does’ complaint that Jane was first taken from her class (and thus separated from the very teacher and classmates who, under Ingraham, were her support) and, second, turned over to Keyes outside the ken of these putative supporters, and the flaw in the majority’s logic becomes all the more apparent. In such isolation, a very young child like Jane could hardly have stood up for herself in light of the actions taken by School officials.
Under the majority’s analysis, the age of the schoolchild is categorically irrelevant to the special relationship inquiry: “No matter the age of the child, parents are the primary providers of food, clothing, shelter, medical care, and reasonable safety for their minor children”; and children return home at the end of each school day.[10] But neither the majority nor any decision it cites explains how or why parents’ care of children before and after the school day can or should preclude the existence of a special relationship during school hours.[11] Although Jane’s parents were presumably able to provide her with food, clothing, and protection before she left home in the morning and after she returned home at the end of each school day, this in no way enabled them to provide for her safety— reasonable or otherwise — throughout the course of the school day. Albeit in dicta, now-Chief Judge Jones exposed the fallacy of holding otherwise in Johnson v. Dallas Independent School District, which involved a shooting committed by a non-student, non-state actor on the school grounds:
The argument against holding that public schools have “custody,” at least for some purposes of protecting their physical well-being, appears to derive less from logic than from a pragmatic desire to limit their legal liability. As has been *879 shown, students must attend school and may not leave without permission. To say that student attendance is voluntary because parents may elect to home-school their children or send them to a private school is lamentably, for most parents, a myth. See D.R. v. Middle Bucks, [972 F.2d 1364, 1380 (3d Cir. 1992) (Sloviter, C.J., dissenting)]. To intimate that parents retain effective responsibility for their children’s well-being when the school alone makes critical decisions regarding student safety and discipline is inaccurate. To suggest that parents somehow are in a better position than the schools to protect their children from the ravages of weapons smuggled onto campus during the school day is cruelly irrational. To hope that students who are unarmed can protect themselves from the depredation of armed criminals in their midst is ridiculous. That parents yield so much of their children’s care into the hands of public school officials may well be argued to place upon the officials an obligation to protect students at least from certain kinds of foreseeably dangerous harm during regular school hours.[12]
This reasoning is all the more powerful when, as here, the schoolchild who suffers injury to her bodily integrity is “very young.” To contend that it is primarily up to parents to prevent public schools from handing off their nine-year-old girls to unknown men during the course of the school day would be outrageous. Yet the majority’s emphasis on parents’ responsibility for their children’s needs, including safety from sexual predation, if not wholly irrelevant, can have no other meaning. At the same time, the majority never addresses just what it is that Jane’s parents conceivably could have done, or should have done, to safeguard her in this situation. Even if it could somehow be imagined that the parents bear some responsibility, such a conclusion cannot be drawn from the Does’ pleadings without the benefit of discovery.
The majority also suggests that the distinction between very young children and older children is “essentially arbitrary.”[13] But, far from being arbitrary, distinguishing between pre-pubescent and pubescent or post-pubescent children is not just natural and intuitive-it is grounded in extensive science.[14] This distinction, which is based on biology and is reflected in the differentiation between elementary school and junior high school, has historically been considered important by the medical profession and society at large.[15] In addressing numerous areas, Congress and state legislatures have treated pre-pubes *880 cent and post-pubescent children differently and have used age as a proxy for that distinction.[16] The particular age selected might appear to be arbitrary (though it could have been informed by expert analysis had this case been allowed to proceed), but not the distinction. A distinction with such deep biological and historical roots, and which remains vital in many legal realms, can hardly be considered “arbitrary.”
The majority also contends that it would be impractical to assess every individual’s characteristics to determine whether a special relationship exists. Not so: A schoolchild’s age is an objective and easily-determined fact. I do not suggest — and we need not decide, in this case — that more subjective factors, such as a specific child’s (Jane’s) mental acuity or degree of social development, should be a part of the special relationship inquiry.[17] Line-drawing is inevitable in this area, but an approach guided by objective facts does not require line-drawing of unusual difficulty. By contrast, an approach that categorically ignores age — by, for example, ignoring the differences between a nine-year-old grammar school girl and a high school senior twice her age — only heightens the arbitrariness of the line demarcating special relationships. Further, the majority’s approach would presumably leave pre-schoolers and even infants in the State’s care unprotected — a patently absurd result.
In short, nine-year-old, elementary-school students in general — not just Jane, subjectively — are significantly distinct from teenage, middle- and high-school students in their ability to provide for their own protection from sex offenders when they are mandatorily separated from their legal guardians during the school day. Jane’s very young age is thus highly relevant to the existence of a special relationship between herself and the School. This factor need not be sufficient alone, however, because the School also affirmatively exercised its power to restrain Jane’s liberty even more strictly, as detailed below.

B. The School Affirmatively Forced Jane into Keyes’s Sole Custody at School and Allowed Keyes to Take Her Away from the School Where She Could Not Protect Herself

Under the well-pleaded allegations of the Does’ complaint, the State had a spe *881 cial relationship with Jane, not just because of her very young age, but also because of the School’s decision, while acting in loco parentis to the exclusion of all others, and pursuant to its express policies, (1) first, to separate Jane from her teachers and classmates, and (2) only then to deliver her into the exclusive custody of Keyes for the express purpose of his taking her away from the school grounds and later returning her there, all during the course of the school day. This affirmative exercise of state power is significant under the Supreme Court’s analysis in Ingraham, quoted by this court in Doe v. Hillsboro Independent School District. By actively removing Jane from the classroom and then delivering her in isolation into Keyes’s custody, the School rendered Jane (1) entirely “apart from teachers and other pupils who may witness and protest any instances of mistreatment,”[18] and (2) not “free to return home”[19] — except, exclusively, at Keyes’s mercy. This was an affirmative exercise of state power, on six separate occasions, that further disabled Jane and further obliged the State to protect her.
We and other courts have held that a special relationship may exist when a state sub-delegates its delegated custody of an individual to a third party. For example, a state has a special relationship with a minor it places in foster care,[20] a burglary suspect it temporarily places in the custody of a private club owner,[21] and a woman it threatens with arrest and physically places in her intoxicated boyfriend’s truck.[22] In none of these or other such cases did a state actor physically hold the victim at the time of the injury (had no de facto “custody”), but the victim “was in the defendant officers’ custody at the time she was forced into” the third party’s control.[23] The State is therefore considered “a participant in the custody which led to the victim’s death [or injury].”[24] The same reasoning has to apply here.
Moreover, these cases demonstrate that the special relationship doctrine is not inflexibly limited to “24/7” incarceration or institutionalization only. Rather than excluding broad areas of state action, such as public schools, from the reach of the special relationship doctrine, we must be sensitive to the factual context in which a case *882 arises.[25] Here, the relevant context includes the School’s affirmative decision to (1) isolate the “very young” Jane from her teachers and classmates and (2) deliver Jane into Keyes’s exclusive custody, in those sequential steps rendering Jane and her parents utterly helpless.
In light of their decision to separate Jane from her teacher and classmates and then release her to Keyes, the school officials’ role was not merely passive or simply negligent, as the majority asserts. The active nature of the School’s role is underscored by the check-out policy in question. That policy admittedly — as the majority opinion states — “permitted school employees to release students to individuals,”[26] but, more importantly, forced Jane, the student to be released, giving her, as well as her teacher, her classmates, and her parents, no choice in the matter.[27] Only by examining the relationship between Jane and the State — not the relationship (for these purposes irrelevant) between the State officials who set the School’s policies and those who implemented them — does the question of a special relationship in this case come into proper focus.
The majority also reasons that the School’s temporary delegation of its exclusive custody of Jane to Keyes does not support the existence of a special relationship because the School did not “knowingly transfer that custody to an unauthorized individual.”[28] A state-knowledge requirement, the majority continues, is “implicit” in the principle that a special relationship may be created only through an “affirmative exercise” of state power.[29] But such a state-knowledge requirement — for which the majority cites no precedent — would not imply that, for there to be a special relationship, the state must know all the circumstances, i.e., each and every discrete fact, surrounding its custody of an individual.[30] As alleged here, the School clearly *883 did affirmatively exercise its powers by separating Jane from her teachers and classmates and delivering her to Keyes, and it did so pursuant to its express policies. School personnel were perfectly aware that they were undertaking these actions — affirmatively, not passively.
It is technically true that the School did not “know” Keyes to be unauthorized, but all it had to do was (1) verify Keyes’s identity, and (2) follow its own express policy by viewing Jane’s check-out form. Although the School’s self-inflicted lack of knowledge could arguably indicate that it was not deliberately indifferent to Jane’s safety, that has nothing to do with the special relationship inquiry. For example, a state has a special relationship with and a concomitant duty to protect a prisoner even if the prisoner is injured because of an unknown or unexpected danger to which the official could not have shown deliberate indifference.[31] To conclude, however, that such a prisoner was never in a special relationship to begin with would be illogical. The same is true in this case. My point: the majority has conflated the special relationship and deliberate indifference inquiries.
Curiously, the majority goes on to assert that it is the Does who have conflated these questions, stating that, under the Does’ theory, the “same act” both creates the special relationship and demonstrates the State’s deliberate indifference.[32] Although it is true, as the majority notes, that the creation of a special relationship does not itself demonstrate deliberate indifference, the Does have never made such a claim. Rather, they allege (1) the special relationship in this case was created when the School placed Jane, a nine-year-old student at a compulsory-attendance public school, in the exclusive custody of Keyes during school hours; and (2) the School officials’ deliberate indifference consisted of their failure to verify Keyes’s identity or his authority to check Jane out of school. And, what could constitute indifference more deliberate than checking Jane out to a man who asserts that he is her mother? It is only natural that the facts underlying the special relationship and those underlying the State’s deliberate indifference are related, but those facts are nonetheless distinct.[33]
The majority also asserts that the School’s act of releasing Jane into Keyes’s custody cannot demonstrate the kind of state custody that is required for a special relationship to exist. This argument ignores the cases discussed above, however, which teach that a special relationship survives a state’s delegation of its exclusive custody to a third party.[34]
*884 Further, the majority’s Wonderland-esque analysis of this point implies that, by removing Jane from her classroom and releasing her to Keyes for a portion of the school day, the School secured rather than restrained Jane’s liberty. Really? In fact and in logic, just the opposite is true. By first isolating her and then delegating its exclusive custody of Jane to Keyes, the School (1) deprived Jane of any potential assistance of teachers and classmates, (2) left Jane helpless against Keyes’s assault, and (3) eliminated any ability that Jane’s parents had to protect her from danger by removing her from the School.[35] Even though Jane’s parents presumably had the general ability to remove her from the School (at least for limited periods of time), neither they nor her teachers nor her fellow pupils had any ability to remove her or otherwise protect her once the School took her from their presence and delivered her into Keyes’s custody. At this crucial juncture, the majority appears to reason that any special relationship there could ever have been between Jane and the School abruptly ceased. But what is the use of the special relationship doctrine and its protection of helpless individuals in the State’s custody, “if it is in effect an umbrella which is taken away as soon as it begins to rain?”[36]
The majority concludes that it is “compelled” to rule that there is no special relationship in this case.[37] Although we have rejected the special relationship theory in most school situations, we have never foreclosed the application of that theory in “extreme circumstances.”[38] Neither have we ever held that characteristics such as very young age are categorically irrelevant to the special relationship inquiry. Indeed, it is for the express reason of Jane’s very young age that the School’s acts in separating her from teachers and classmates during school hours and delivering her to Keyes caused Jane and her parents to have “no realistic means of voluntarily terminating the state’s custody” and no “ability or opportunity to provide for [her] own care and safety.”[39] I remain convinced that, under the Does’ allegations, the State had a constitutional duty to protect Jane.
II. DELIBERATE INDIFFERENCE
A state does not violate its substantive due process duty to protect an individual pursuant to a special relationship when it merely acts negligently. Such a violation occurs when the state acts with “deliberate indifference” to that individual’s health or safety.[40] Thus, in addition to alleging that a special relationship existed between Jane and the School, the Does needed to allege adequately that the School officials acted, at the very least, with deliberate indifference. “To act with deliberate indifference, a state actor must consciously disregard a *885 known and excessive risk to the victim’s health and safety.”[41] Even though the majority does not reach this issue, any objective reading of the Does’ complaint confirms that they have quite adequately pleaded that the State acted with deliberate indifference to Jane’s safety.
The Does allege with specificity that the School adopted and implemented a flawed check-out policy despite its knowledge that the specific policy thus adopted posed excessive risks to students. In particular, the Does allege that the School’s check-out policy included a “Permission to CheckOut” form for each student which listed by name the only adults authorized to check out that student during the school day. The Does also allege that (1) the policy did not direct School officials to verify the identity of an adult requesting to check out a student, and (2) the School failed adequately to train and supervise the cognizant officials in the proper administration of the check-out policy. The Does further allege that these “customs and practices guaranteed that verification would not be checked which created an unreasonable danger to the minor child named herein.” Thus, when Keyes checked Jane out on multiple occasions as her “father” (and, on at least one occasion, as her “mother”), School officials neither (1) verified Keyes’s identity, nor (2) referred to Jane’s checkout form, on which Keyes was not listed as an individual authorized to take custody of Jane.[42]
Importantly, the Does’ pleadings expressly state that the School’s officials were well aware of the risks that their flawed policies engendered, alleging that:
Upon information and belief, the Education Defendants received complaints and inquiries and/or had internal discussions and safety meetings concerning checkout policies and procedures and access to students under their care and control by unauthorized individuals. The complaints, inquiries, discussions, and/or meetings show that the Education Defendants had actual knowledge of the dangers created by their policies, customs, and regulations, but they failed to take corrective action to reduce or prevent the danger.
These discrete allegations are sufficient to state a claim that School officials acted with deliberate indifference to a known risk to Jane’s safety.
True, the Does do not allege that School officials knew that Keyes, in particular, was dangerous. But, “this court has never required state officials to be warned of a specific danger.”[43] Indeed, state officials may be deliberately indifferent even if they do not know which particular individual poses the safety risk, or which potential victim will ultimately be injured.[44] An *886 official is deliberately indifferent if he knows of and disregards “a substantial risk of serious harm.”[45] And it is such awareness that the Does precisely allege.
The defendants’ awareness of this risk to student safety is eminently plausible in light of (1) the alleged complaints, inquiries, discussions, and meetings among the defendants on the subject of unauthorized individuals’ access to students; (2) the School’s allowing Keyes to check out Jane on at least six occasions, including one occasion when he signed her out as her mother, which these officials had to have known was bogus; and (3) the general awareness by schools and school boards' — ■ heightened in recent years — of the threat posed in the elementary school setting by deviant adults to young children.[46]
With regard to the last point, we learned in a recent appeal of a nationwide program employing an electronic tracking system to identify whether visitors to primary and secondary schools were registered sex offenders or otherwise presented threats to young students.[47] By 2006, the school year immediately preceding the one at issue here, this program had been endorsed by the U.S. Department of Justice, had received federal grant money, and had already been activated in at least 1,400 schools in some 100 school districts across ten states. In light of the ubiquitous awareness by schools of the threat posed by deviant adults preying on very young schoolchildren, it is certainly “plausible,” and indeed highly likely, that the School knew that it was playing with fire. Of course, nothing more than plausibility is required at this stage of the proceedings.[48]
Despite their alleged awareness of the risk, School officials nevertheless checked Jane out to a man whose identity and authority they never bothered to verify. These allegations are sufficient, at least at this initial motion-to-dismiss stage, to state an actionable constitutional claim grounded in deliberate indifference.
III. CONCLUSION
Any case involving the rape of a child is, of course, a terrible one, so why is this case so shocking? Part of the special horror of this case is the appalling way in which Jane’s parents’ state-mandated trust in public school officials for the care and safety of their very young child was rewarded. In a case such as this, in which the alleged actions of state officials “shock the conscience,”[49] the proper remedy is not merely to compensate the victim in tort, but, additionally, to compensate all of us with a constitutional remedy under 42 U.S.C. § 1983, which is intended “to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails.”[50]
As one of our Tenth Circuit colleagues has aptly observed, “[w]e do not adequately discharge our duty to interpret the Constitution by merely describing the facts as *887 ‘tragic’ and invoking state tort law[.]”[51] Neither do we adequately discharge our duty by interpreting the special relationship doctrine so narrowly that a helpless nine-year-old girl, abruptly removed from her classroom by school personnel and wrongly delivered to an unauthorized grown man, falls through the mesh of the Constitution’s safety net. The Does have more than adequately alleged discrete facts to show that the State had a constitutional duty to protect Jane and that it failed abysmally in that duty. These are the reasons why I dissent.

. Ashcroft v. Iqbal, 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009); Bell Atl. Corp. v. Twombly, 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007).

. DeShaney v. Winnebago County Dept. of Social Services, 489 U.S. 189, 199-200, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989).

. Rochin v. California, 342 U.S. 165, 172, 72 S.Ct. 205, 96 L.Ed. 183 (1952).

. DeShaney, 489 U.S. at 199-200, 109 S.Ct. 998 (citation omitted; emphasis added).

. See Miss.Code Ann. § 37-13-91(3) (school attendance generally compulsory for children between the ages of six and seventeen).

. Contra Doe v. Hillsboro Indep. School Dist., 113 F.3d 1412, 1414 (5th Cir. 1997) (no special relationship when student was raped after school hours).

. 113 F.3d 1412, 1415 (5th Cir.1997) (quoting Ingraham v. Wright, 430 U.S. 651, 670, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977) (emphasis added)).

. See supra, En Banc Majority Opinion at 859, note 5.

. See A. v. Laredo Indep. School Dist., No. 5:05-cv-237, 2007 WL 189458, at *4 (S.D.Tex. Jan.22, 2007) ("The notion that a seven year-old child can be expected to assert his liberties in the face of institutional authority is questionable to say the least .... One may intuitively conclude that this reality gives rise to a commensurate supervisory duty to protect the child's basic physical safety.”).

. See supra, En Banc Majority Opinion at 859.

. See D.R. by L.R. v. Middle Bucks Area Vocational Technical School, 972 F.2d 1364, 1379 (3rd Cir.1992) (Sloviter, C.J., dissenting) ("DeShaney contains no language to support the ... holding that the duty to protect can be triggered only by involuntary, round-the-clock, legal custody."); see also id. at 1381 ("prisoners are probably much more articulate about their complaints about mistreatment than are school children, particularly when the treatment consists, as in this case, of sexual abuse”).

. 38 F.3d 198, 203 n. 7 (5th Cir.1994).

. See supra, En Banc Majority Opinion at 859-60.

. See Theresa O'Lonergan & John J. Zodrow, Pediatric Assent: Subject Protection Issues Among Adolescent Females Enrolled in Research, 34 J.L. Med. & Ethics 451, 454 (2006) ("Sexual development is the morphologically recognizable hallmark of adolescence. Of particular interest here is the bald fact that adolescent girls can conceive and bear children.").

. See id. at 454-55 (footnotes omitted):
Adolescence is, by definition, a convergence of developmental factors. Historically, the law, religion and society have implicitly applied the "rule of sevens” to assign legal and moral responsibility to children and adolescents. Courts have treated seven-year-olds as capable of distinguishing right from wrong .... Likewise, religions and courts have treated fourteen-year-old adolescents as far more accountable than younger children for their actions and, in many cases, assign culpability .... [P]hysicians generally acknowledge that adolescents are differentially equipped to make medical decisions from thirteen years to adulthood .... In most states, adolescents may seek and obtain sexual and reproductive health information and services without the per *880 mission of or even notification of their parents.

. See, e.g., Fair Labor Standards Act, 29 U.S.C. §§ 201-19 (setting fourteen as the minimum age for most non-agricultural work); see also Charles A. Phipps, Misdirected Reform: On Regulating Consensual Sexual Activity Between Teenagers, 12 Cornell J.L. & Pub. Pol’y 373, 429-31 (2003) (footnotes omitted):
Without exception, the law in all fifty states prohibits sexual activity between an adult and a pre-pubertal child .... [T]he criminal law treats post-pubescent victims differently from pre-pubescent victims. While post-pubertal minors are still deemed incapable of consenting to sexual activity with adults, the fact that they have reached puberty generally translates into lower criminal penalties for those who engage in sexual activity with victims in this category. Because the age of consent in the majority of states is sixteen, this means that [this type of post-pubertal] victim generally is one aged fourteen or fifteen.

. It is worth noting, however, that the Supreme Court has considered such subjective factors in holding that a state’s duty to protect an involuntarily committed psychiatric patient extends to "such training as may be reasonable in light of [the patient’s] liberty interests in safety and freedom from unreasonable restraints [.]". Youngberg v. Romeo, 457 U.S. 307, 322, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982). If individual characteristics were categorically irrelevant, then Youngberg would not have defined a state's constitutional duties to institutionalized psychiatric patients any more broadly than its duties to competent adult prisoners.

. Doe v. Hillsboro Indep. School Dist., 113 F.3d at 1415 (quoting Ingraham, 430 U.S. at 670, 97 S.Ct. 1401).

. Id.

. Griffith v. Johnston, 899 F.2d 1427, 1439 (5th Cir.1990) (state agency "created a 'special relationship’ ... when it removed [children] from their natural homes and placed them under state supervision. At that time, [the state agency] assumed the responsibility to provide constitutionally adequate care for these children.”); see also DeShaney, 489 U.S. at 201 n. 9, 109 S.Ct. 998 ("Had the State by the affirmative exercise of its power removed [the child] from free society and placed him in a foster home operated by its agents, we might have a situation sufficiently analogous to incarceration or institutionalization to give rise to an affirmative duty to protect.”).

. Horton v. Flenory, 889 F.2d 454, 458 (3d Cir. 1989) (state had duty to protect plaintiff when, pursuant to state policies, police officer left plaintiff in custody of club owner, who beat plaintiff to death).

. Stemler v. City of Florence, 126 F.3d 856, 868-69 (6th Cir. 1997) (state had duty to protect woman who "was rendered unable to protect herself by virtue of both the threat of arrest and her physical placement in the truck by the officers”; woman was then killed when her boyfriend crashed the truck into a guardrail); see also Davis v. Brady, 143 F.3d 1021, 1024-26 (6th Cir.1998) (state had special relationship with intoxicated police-car passenger abandoned on a highway).

. Stemler, 126 F.3d at 869.

. Horton, 889 F.2d at 458.

. See, e.g., Estate of Lance v. Lewisville Indep. School Dist., No. 4:1 1-CV-00032, 2011 WL 4100960, at *7-8 (E.D.Tex. Aug. 23, 2011), adopted, 2011 WL 4101164 (E.D.Tex. Sept. 13, 2011) (engaging in such an analysis and holding that the plaintiff adequately alleged a special relationship when a very young, disabled child was placed in in-school suspension); Teague ex rel. C.R.T. v. Texas City Indep. School Dist., 348 F.Supp.2d 785, 792-93 (S.D.Tex.2004) (construing special relationship doctrine "in the context of this particular plaintiff” and holding that the plaintiff adequately alleged a special relationship between a public school and a child with Down’s Syndrome), vacated, 386 F.Supp.2d 893, 896 (S.D.Tex.2005) (granting summary judgment to defendant when discovery revealed that the victim was in fact 18 years old at the time of the incident, was no longer subject to compulsory attendance, and had the mental capacity of a 13 year-old).

. See supra, En Banc Majority Opinion at 853.

. The complaint does not reveal Jane’s reactions to being placed in Keyes’s custody. Only discovery or trial evidence could resolve such an issue. In any event, a nine-year-old's possible failure affirmatively to protest being placed in the custody of a grown man, even one who repeatedly raped her, surely does not somehow convert that custody from involuntary to voluntary.

. See supra, En Banc Majority Opinion at 861.

. DeShaney, 489 U.S. at 200, 109 S.Ct. 998 ("when the State by the affirmative exercise of its power so restrains an individual’s liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs — e.g., food, clothing, shelter, medical care, and reasonable safety — it transgresses the substantive limits on state action set by the Eighth Amendment and the Due Process Clause”).

. For example, if a state inadvertently imprisons the wrong person, it still owes a duty to protect the person it actually did imprison. The state’s error in this regard does not immunize it from the constitutional consequences of its known, affirmative exercise of power-imprisoning the individual.

. For example, in Vamado v. Lynaugh, 920 F.2d 320, 321 (5th Cir. 1991), we held that a state was not deliberately indifferent to a prisoner's serious medical needs when it allegedly failed to recognize the purported danger of forcing the prisoner to stand in line for meals. The state’s lack of knowledge about this risk, however, did not imply that the state never had a duty to protect the prisoner at all.

. See supra, En Banc Majority Opinion at 861-62.

. Even if some of the same facts are relevant to both the special relationship and deliberate indifference inquiries, that does not mean that these prongs are somehow conflated under the Does’ theory. See Stemler, 126 F.3d at 867 (describing these as "distinct, though interrelated inquiries”). For example, suppose that a state places a prisoner in an unreasonably unsafe prison — a clear 42 U.S.C. § 1983 claim under a special relationship theory. That placement, it could be argued, underlies both the special relationship and the state's putative deliberate indifference to the prisoner’s reasonable safety. Yet none could deny that this scenario presents an actionable constitutional claim.

. See Stemler, 126 F.3d at 869, Griffith, 899 F.2d at 1439; Horton, 889 F.2d at 458.

. Even assuming arguendo that the School’s duty to protect Jane would have been ceased had it released her to an authorized individual, that is not what happened in this case.

. Abba Eban, Statement to the United Nations Security Council (June 6, 1967), available at http://www.mfa.gov.il/MFA/Foreign-lRelations/Israels + Foreign + Relations + since +1947/1947-1974/19 + Statement + to + the -I- Security + Council -I- by + Foreign + Mi. htm.

. See supra, En Banc Majority Opinion at 862.

. Walton v. Alexander, 44 F.3d 1297, 1305 (5th Cir.1995) (finding no special relationship when student voluntarily attended state school for the deaf).

. Id.

. Hernandez ex rel. Hernandez v. Texas Dept. of Protective and Regulatory Servs., 380 F.3d 872, 880 (5th Cir.2004).

. Id.

. Had this case been allowed to proceed, the defendants would have remained free to raise any independent reasons that the School’s officials might have had to believe that Keyes was authorized to check out Jane or did not pose a danger to her.

. Hernandez, 380 F.3d at 881.

. Farmer v. Brennan, 511 U.S. 825, 843, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) ("Nor may a prison official escape liability for deliberate indifference by showing that, while he was aware of an obvious, substantial risk to inmate safety, he did not know that the complainant was especially likely to be assaulted by the specific prisoner who eventually committed the assault.”); Curry v. Scott, 249 F.3d 493, 507 (6th Cir.2001) (" 'actual knowledge’ does not require that a prison official know a prisoner would, with certainty, be harmed, or that a particular prisoner would be harmed in a certain way”); see also Rosa H. v. San Elizario Indep. School Dist., 106 F.3d 648, 659 (5th Cir.1997) (for "actual notice” purposes, “[s]tudents need not show that the *886 district knew that a particular teacher would abuse a particular student”).

. Farmer, 511 U.S. at 837, 114 S.Ct. 1970.

. This threat is arguably heightened in the middle of the school day, when — unlike at the end of the school day — an unauthorized adult seeking to take custody of a child will presumably not be confronted with the child’s actual parent or guardian.

. Meadows v. Lake Travis Indep. Sch. Dist., 397 Fed.Appx. 1 (5th Cir.2010) (unpublished).

. Twombly, 550 U.S. at 570, 127 S.Ct. 1955.

. Rochin, 342 U.S. at 172, 72 S.Ct. 205.

. Wyatt v. Cole, 504 U.S. 158, 161, 112 S.Ct. 1827, 118 L.Ed.2d 504 (1992).

. Maldonado v. Josey, 975 F.2d 727, 735 (10th Cir.1992) (Seymour, J., concurring).