# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**
October 1, 2012

Lyle W. Cayce
Clerk

No. 11-20154

CHANEL HALL, Individually and as next friend and personal representative of the estate of J.C.P.,

Plaintiff - Appellant,

v.

LASANDRA SMITH; TEXAS DEPARTMENT OF FAMILY AND PROTECTIVE SERVICES; JOYCE JAMES; CYNTERA DONATTO; KEITH LASCO; LUTHERAN SOCIAL SERVICES OF THE SOUTH,

Defendants - Appellees.

Appeal from the United States District Court
for the Southern District of Texas
USDC 4:09-CV-2611

Before STEWART, Chief Judge, and ELROD, and SOUTHWICK, Circuit Judges.

PER CURIAM:[*]

This case involves the tragic death of a young child while she was in the custody of a foster parent. The child's natural mother, Chanel Hall ("Hall"), brought this action against the Texas Department of Protective and Regulatory Services ("TDPRS"), several TDPRS employees, and Lutheran Social Services of the South ("Lutheran"), alleging violations of 42 U.S.C. § 1983 and Texas

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

common law.  Hall appeals the district court's grant of summary judgment to TDPRS and its employees and the denial of her motion for leave to amend her complaint to include a § 1983 claim against Lutheran.  For the reasons that follow, we AFFIRM the district court's rulings.

## I.

The events in this case involve the tragically short life of Jasmine Chanel Preston ("Jasmine").  Jasmine was born on June 24, 2007, approximately eight weeks prematurely.  She suffered from several life-threatening medical problems, including an abnormality in her airway that made it difficult for her to breathe.  Shortly after her birth she was transferred to Memorial Hermann Hospital, where doctors inserted an intubation tube into her throat to help her breathe.  Jasmine continued to be treated at Memorial Hermann and on December 21, 2007, she accidentally pulled out her intubation tube.  Doctors had difficulty re-intubating her and expressed concern that a similar incident could result in Jasmine's death.  Based in part on this incident, doctors recommended that Jasmine undergo surgery allowing doctors to insert a tracheostomy tube that would provide a more stable method of providing Jasmine with the air she needed to stay alive.[1]

Doctors attempted to obtain Hall's consent to this surgery, however Hall requested a second opinion on the necessity of the recommended procedure.  Memorial Hermann agreed to this request and a second doctor provided Hall with the opinion that the insertion of a tracheostomy tube was necessary.  At this point, Hall demanded another opinion, this time from a doctor outside of Memorial Hermann.  Attempting to meet Hall's request, Memorial Hermann arranged to transfer Jasmine to Texas Children's Hospital but could not get in touch with Hall to complete the transfer.  Eventually, it was discovered that

---

[1] Doctors had been recommending this procedure for a few months, however this incident increased the perceived urgency for the surgery.

Hall's insurer would not pay for a transfer to another hospital, but Hall still would not consent to the surgery.

On December 24, 2007, doctors from Memorial Hermann referred Hall to TDFPS because Hall would not consent to the surgery they believed Jasmine urgently needed. Cyntera Donatto, a TDFPS employee, was assigned to Jasmine's case and conducted an investigation, speaking with Hall and individuals at Memorial Hermann about Jasmine's situation. After completing its investigation, TDFPS concluded that Hall's delay in consenting to the surgery amounted to medical neglect and obtained temporary custody of Jasmine to allow Memorial Hermann to perform the tracheotomy. Jasmine's tracheotomy was conducted in late January and she remained hospitalized until June. In June 2008, upon Jasmine's release from the hospital, she returned to Hall's custody.

Only a few months later, in early August, Jasmine was readmitted to the hospital after suffering second-degree burns resulting from being bathed in extremely hot water by Hall.[2] After this incident, TDFPS opened another investigation into Jasmine's care and sought conservatorship of her. LaSandra Smith ("Smith"), a TDFPS employee,[3] was assigned as Jasmine's care worker. On September 11, 2008, a state court entered an agreed order requiring TDFPS to place Jasmine in foster care upon her release from the hospital and permitting Hall supervised access to Jasmine.

Pursuant to this order, Smith placed a request with the TDFPS

---

[2] Hall admits that she did not test the temperature of the bath water before immersing Jasmine in it, however she claims that the incident was accidental and resulted from recent plumbing work at her home. A court appointed child advocate concluded that "a reasonable person would expect a mother to test the temperature of the bath water of a child especially when the child is unable to cry in a manner to demonstrate discomfort. Due to Jasmine's tracheotomy [sic], her cry [was] not audible."

[3] TDFPS employees Joyce James, deputy commissioner, and Keith Lasco, a care worker assigned to Jasmine's case after the initial investigation, have also been included as Appellees on Hall's declaratory relief claims. We address these claims in Part IV *infra*.

Centralized Placement Team ("CPT") for a foster home placement. A few days later, CPT notified Smith that Jasmine would be placed with Joanie Cochran ("Cochran"), a licensed vocational nurse. Lutheran, a child placement agency that provides foster placement services pursuant to a contractual relationship with TDFPS, ensured that Cochran was qualified and trained to provide care for Jasmine. Cochran was employed outside of the home and required additional caregivers to provide care for Jasmine. Accordingly, caregivers were hired to assist in Cochran's home after Lutheran verified their qualifications and training. Upon Jasmine's release from the hospital on October 8, 2008, she was placed in Cochran's home.

During Jasmine's stay with Cochran, Hall had regular supervised visits with Jasmine. After meeting Cochran for the first time, Hall expressed concern to Smith about Cochran's personal appearance and hygiene. Specifically, Hall explained that she was concerned Cochran was a drug user because her "hair was greasy, her nails and feet were dirty and her teeth were rotted [sic]." In December 2008, Hall allegedly observed Cochran traveling with Jasmine without her oxygen monitor. Hall reported this incident to Smith on several occasions. During Jasmine's placement with Cochran, Smith, on at least a monthly basis, visited with Jasmine and her caregivers. Smith documented her observations from these meetings, including Jasmine's adjustment to her placement, her interactions with foster siblings, and her physical condition. Smith also observed and documented Jasmine's condition during her supervised visits with Hall. Finally, Smith's monthly evaluations document situations where Jasmine required medical attention and discuss the care Jasmine was receiving for her ongoing medical issues. Jasmine also received rehabilitative services from Early Childhood Intervention ("ECI"), services beneficial to Jasmine's physical

development, on a regular basis beginning in February 2009.[4]

On June 3, 2009, Cochran, Smith, and Hall met with Dr. Edmonds, an ear, throat, and nose specialist, who advised that Jasmine's trachea was obstructed by scar tissue. During the meeting, Dr. Edmonds also discussed the results of Jasmine's sleep study that had been conducted a few weeks earlier. Smith's notes regarding this meeting noted that Dr. Edmonds explained surgery was required "sometime [that] summer" to repair the obstruction, cautioning that Jasmine was at risk of brain damage or death if her tracheostomy tube was dislodged. Dr. Edmonds sent a letter the same day to Dr. Liaw, Jasmine's pediatrician, explaining that he "recommended that she undergo reconstructive surgery as soon as is feasible." He further explained that "[b]ecause of the life-threatening nature of this [condition], I have further recommended that Jasmine have 24-hour nursing care. If her tracheostomy tube were to become dislodged, she may suffer life-threatening consequences." Following this meeting, Smith was informed on June 10, 2009 that a recommendation had been made that Jasmine undergo a second sleep study prior to surgery, and on June 24, 2009, Smith was informed that Dr. Edmonds had requested 24-hour nursing care for Jasmine.

On June 23, 2009, an agreement was reached to place Jasmine with Hall's relatives after Jasmine's recommended surgery was completed. The agreement contemplated transferring Jasmine to HealthBridge Children's Hospital on July 1, 2009, the date the agreement was expected to be presented and approved by the court. Pursuant to the agreement, after Jasmine had recovered from surgery, and Hall's relatives had completed training on caring for Jasmine, Jasmine would be placed in their home. At the hearing on July 1, 2009, a letter

---

[4] There is some ambiguity relating to the rehabilitative services Jasmine initially received during her stay with Cochran. Specifically, Smith received an e-mail in December informing her that Cochran had declined ECI rehabilitative services, but it is unclear whether Jasmine was receiving other similar services at that time.

was presented to the court from Dr. Liaw.  The letter, which had been prepared on June 30, 2009, explained as follows:

> I saw Jasmine on June 25, 2009 . . . . She is doing very well considering her long list of medical problems. . . . The plan is for her to have surgery as soon as possible for placement of a stint to hopefully keep her airway open.  If her tracheostomy were to come out it would be just about impossible to ventilate her with a bag and mask and probably [would] result in her death.
>
> As her PCP and attending physician at Healthbridge Children's Hospital, it is my recommendation that she remain in her current placement at least until after her surgical procedure.  She has adequate nursing in her home environment, and the home environment is more conducive to avoiding hospital acquired infections.  After her up coming [sic] surgery then the court can revisit alternative placement options.

The court, after considering this letter, recessed the hearing until July 8, 2009 so that Dr. Liaw could provide the court with further information.

When the hearing resumed on July 8, 2009, Dr. Liaw repeated his recommendation that Jasmine remain at Cochran's home until her surgery. When asked what was causing the delay in Jasmine's surgery, he responded: "[t]hat would be in Dr. Edmonds' realm . . . I don't know."  The court, after considering this testimony, ordered that Jasmine remain at Cochran's home until the surgery and then only be moved to her new placement with Hall's relatives after she had fully recovered.  Additionally, the court instructed TDFPS to request that Jasmine's surgery be scheduled as soon as possible.

Later that same day, Smith contacted Dr. Edmonds' office and explained the court's request that Jasmine be scheduled for surgery as soon as feasible. Smith was informed that Dr. Edmonds would need to review the results of the sleep study, which had been conducted on July 7, 2009, before the surgery could be scheduled.  The record does not indicate whether the surgery was ever scheduled by Dr. Edmonds, nor does it indicate what contributed to the delay.

Tragically, only days later in the early morning hours of July 12, 2009,

Jasmine died in the manner predicted by Dr. Edmonds and Dr. Liaw. On July 11, 2009, Jasmine was playing on the ground near the couch in Cochran's home. At the time of the incident, Cochran and Jackie Lollis, a licensed vocational nurse who often helped out at the Cochran home, were both at the home. Cochran had just finished changing another foster child's diaper and was in the kitchen throwing away the diaper. Lollis, who was sitting on the couch about three feet from Jasmine working on paperwork,[5] saw Jasmine fall down and went to pick her up. At that time, she noticed that Jasmine's tracheostomy tube was out and immediately alerted Cochran who ran back to assist. Around this time, they heard the oxygen monitor alert, signaling that Jasmine's oxygen saturation level was too low. They quickly carried Jasmine to a nearby bed, laid her down, and attempted to re-insert the tube. Their initial attempts were unsuccessful, but eventually, they were able to re-insert the tube. Cochran called 911, and Lollis proceeded to administer CPR and gave Jasmine oxygen with an oxygen bag until EMS arrived. EMS took Jasmine to East Houston Hospital and from there Jasmine was life-flighted to Memorial Hermann, where she was pronounced dead in the early morning hours of July 12, 2009.[6]

---

[5] TDFPS conducted an investigation of the circumstances surrounding Jasmine's death. Based on the finding that Lollis was working on paperwork, it cited Lutheran for a violation of Rule No. 749.2593(a)(5), which requires caregivers to refrain from tasks that "clearly impede the caregiver's ability to supervise and interact with the children."

[6] Hall disputes the version of events surrounding Jasmine's death, based on an affidavit provided by Patsy Minchew. Minchew explains that her ex-husband told her that "Jasmine was dead for several hours before anyone discovered her body or called 911." This hearsay version of Jasmine's death is inconsistent with the undisputed facts contained in the summary judgment record. Specifically, it is undisputed that Jasmine (1) was treated by EMTs on the way to East Houston Hospital, (2) was life-flighted to Memorial Hermann for further attempts to save her life, and (3) survived until the early morning hours of July 12, 2009. Even if Minchew's affidavit created a genuine issue of fact, it is not material to Hall's claims against Smith because there is no indication that Smith was, or should have been, aware of a risk that Jasmine would be left alone for hours at a time while in Cochran's care.

Hall filed suit in state court on July 20, 2009 against numerous defendants who subsequently removed the case to federal court.[7]   After Hall filed an amended complaint, each Appellee filed dispositive motions.  Lutheran, sued only on state law claims, filed a motion to dismiss.  Hall filed a response opposing Lutheran's motion to dismiss on its merits and noting that she had inadvertently omitted a § 1983 claim against Lutheran, but provided no explanation of the omitted § 1983 claim.  TDFPS and its employees filed a motion for summary judgment, which they amended on February 4, 2010.  On February 5, 2010, Hall responded with a request for additional discovery, but did not respond to the merits of the motion for summary judgment.  On February 8, 2010, at Hall's request, the district court held a hearing and ordered that TDFPS produce certain discovery and make certain employees available for depositions within 60 days.  On August 11, 2010, Hall filed a motion to compel Lutheran to provide discovery.  Lutheran filed a response on August 19, 2010.

On September 30, 2010, before Hall had filed a response to the merits of the motion for summary judgment, the district court entered an opinion granting the motion for summary judgment filed by TDFPS and its employees and Lutheran's motion to dismiss.  Also, interpreting Hall's vague reference to a § 1983 claim as a request for leave to amend, the district court denied the request as futile because Hall offered no suggestion of any basis to assert such a claim against Lutheran.

Hall filed a motion for reconsideration of the dismissal of her claims against TDFPS and its employees.  That motion for reconsideration did not mention the district court's dismissal of her claims against Lutheran, but Hall also filed a "Reply in Answer to the Court's Dismissal," in which she proposed

---

[7]  Hall's lawsuit involved numerous other individuals and entities, however she has only appealed the district court's disposition of certain claims against TDFPS, certain TDFPS employees, and Lutheran.  We limit our review to facts and claims relevant to Hall's appeal.

to amend her already-dismissed complaint to state a claim under § 1983 against Lutheran that she had inadvertently left out of her amended complaint.  Hall attached various exhibits to each of her filings and, now on appeal, cites to that evidence to challenge the district court's decisions on the dispositive motions. After Lutheran opposed Hall's unorthodox method of challenging the district court's decision to grant its motion to dismiss, Hall filed an actual motion for reconsideration of the dismissal of claims she had previously asserted against Lutheran and for the first time properly sought leave to amend to assert a § 1983 claim against Lutheran.  Lutheran and the TDFPS defendants responded to each of these motions.

On February 7, 2011, the district court denied Hall's request for reconsideration.  Although the district court determined that there was no basis to reconsider its prior rulings, it nevertheless considered the evidence offered by Hall in great detail, ultimately concluding that the new evidence did not raise a genuine issue of fact material to qualified immunity.  The district court also concluded that Hall failed to show a basis for granting her leave to amend to include a § 1983 claim against Lutheran.  The district court remanded Hall's remaining state law claims.

Hall filed a notice of appeal indicating that she appeals from the memorandum and order "dismissing, with prejudice, the claims against the above-named defendants and entered in this action on the 7th day of February, 2011."  Hall's briefs, instead of challenging the district court's denial of her motion for reconsideration entered on February 7, 2011, appear to challenge the district court's opinion entered on September 30, 2010. Specifically, Hall appeals the district court's: (1) decision to rule on the motion for summary judgment filed by TDFPS and its employees prior to Hall's response; (2) dismissal of Hall's claims for declaratory relief against TDFPS and its employees; (3) denial of Hall's motion for leave to amend her complaint to include a § 1983 claim against Lutheran; (4) conclusion that Smith was entitled to qualified immunity from

Hall's claim that Smith violated Jasmine's substantive due process rights; and (5) conclusion that the Texas Tort Claims Act barred Hall's claim against TDFPS for wrongful death.

The Appellees jointly moved to dismiss Hall's appeal for lack of jurisdiction, claiming that the district court orders are not final judgments and are therefore inappropriate subjects for appellate review. Lutheran also moved this court to dismiss Hall's appeal of the district court's denial of her motion to amend to include a § 1983 claim against it, arguing that Hall had failed to allege her § 1983 claim within the statute of limitations. This court denied both motions.[8]

## II.

Initially, we must address the Appellees' contention that we lack jurisdiction over Hall's appeal. Federal Rule of Appellate Procedure 3(c)(1)(B) requires an appellant to "designate the judgment, order, or part thereof being appealed." Fed. R. App. P. 3(c)(1)(B). This court utilizes a "liberal construction" policy when a notice of appeal, albeit technically deficient, is clear in its intent to appeal an order. *See Trust Co. Bank v. U.S. Gypsum Co.*, 950 F.2d 1144, 1148 (5th Cir. 1992) ("Interpreting notices of appeal liberally, this Court often has exercised its appellate jurisdiction—despite an improper designation under Rule 3(c)—where it is clear that the appealing party intended to appeal the entire case."); *C.A. May Marine Supply Co. v. Brunswick Corp.*, 649 F.2d 1049, 1056 (5th Cir. 1981) (per curiam) ("[A] policy of liberal construction of notices of appeal prevails in situations where the intent to appeal an unmentioned or mislabeled ruling is apparent and there is no prejudice to the adverse party.").

---

[8] As to the joint motion to dismiss, we explained that there were sufficient indicia of the district court's intent to enter a final, appealable judgment. As to the statute of limitations argument, we explained that dismissal of an appeal is not the proper remedy for a successful limitations defense. Where the appeal itself is timely filed, and there is no defect in appellate jurisdiction, the appeal is to be resolved on the merits, including consideration of any limitations defense.

No. 11-20154

Hall's notice of appeal explicitly references the February 7, 2011 order denying Hall's motions for reconsideration and leave to amend, but does not expressly refer to the September 30, 2010 order dismissing her claims against the Appellees. Nevertheless, although Hall does not explicitly mention the September 30, 2010 order, the notice of appeal explains that she appeals from the order "dismissing, with prejudice, the claims against" the Appellees—directly referring to the order entered on September 30, 2010. It is clear that Hall intended to appeal the dismissal of her claims against Appellees, not merely the denial of her motion for reconsideration. Moreover, Appellees will not suffer any prejudice if this court exercises appellate jurisdiction over Hall's appeal. We conclude that Hall's notice of appeal, while technically insufficient, is effective and permits this court to exercise appellate jurisdiction over both orders entered by the district court. *See Trust Co. Bank*, 950 F.2d at 1148.

III.

Hall appeals the decision by the district court to grant the dispositive motion filed by TDFPS and its employees prior to receipt of a response to the merits of the motion by Hall. Specifically, Hall argues that it was an abuse of discretion for the district court to "cut off discovery and rule on the . . . summary judgment motion without notice." We disagree. Although there were circumstances that could have supported an extension of time to respond to the motion for summary judgment,[9] the impact of these circumstances on Hall's ability to respond to the motion for summary judgment were not made known to the district court.

---

[9] For instance, there was an outstanding motion for a status conference filed by the defendants seeking clarification of the impact of the February 8, 2010 discovery hearing on the case dispositive motion deadline and Hall had made a request for production of documents from Lutheran that Hall believed was relevant to her claims against the TDFPS defendants. Also, Hall was diagnosed with lung cancer during this time period and her counsel ceased working on the case due to Hall's financial constraints.

The district court's local rules provide that a response to a properly filed motion for summary judgment must be filed 21 days after filing. S.D. Tex. L.R. 7.3 & 7.4. This court has held that a district court does not abuse its discretion by granting summary judgment after the local rule's response deadline has passed. *Daniels v. Morris*, 746 F.2d 271, 275 (5th Cir. 1984). We have explained that when "the parties have been given ample opportunity to respond to the motion for summary judgment, the district judge may rule on it even after a significant delay, without giving the parties advance notice of the court's intention to consider and decide the motion on a 'date certain.'" *Id.* at 275-76.

In this case, the TDFPS defendants filed their amended motion for summary judgment on February 4, 2010. Hall filed a response on February 5, 2010, requesting discovery on the qualified immunity defense but failing to respond to the merits of the motion. After holding a hearing on February 8, 2010, the district court ordered that TDFPS produce certain discovery and make certain employees available for depositions within 60 days. On September 30, 2010, over five months after the targeted discovery was expected to be completed, the district court entered an opinion granting the TDFPS defendants' motion for summary judgment. Hall has not argued that the district court induced her failure to respond, but rather acknowledges that other factors were the cause of her inability to respond during the five-month period following the date the district judge expected the targeted discovery to be completed. Accordingly, we conclude that the district court did not commit reversible error by ruling on the TDFPS defendants' motion for summary judgment.

## IV.

Hall next argues that the district court erred by concluding that she was not entitled to declaratory relief. Hall mistakenly challenged what she believed was a finding that these claims failed based on a qualified immunity defense.

The district court, however, did not deny Hall's requests for declaratory relief based on a finding of qualified immunity—rather, the district court denied Hall's claims for declaratory relief based on a lack of standing.[10]  We agree that Hall lacks standing for the requested declaratory relief.  *See, e.g.*, *Bauer v. Texas*, 341 F.3d 352, 358 (5th Cir. 2003) (citations omitted) ("In order to demonstrate that a case or controversy exists to meet the Article III standing requirement when a plaintiff is seeking injunctive or declaratory relief, a plaintiff must allege facts from which it appears there is a substantial likelihood that [s]he will suffer injury in the future.").  Hall has failed to allege facts that demonstrate any likelihood that she will suffer injury in the future that the declaratory relief she seeks would redress.  Accordingly, we affirm the district court's conclusion that we lack subject-matter jurisdiction over her claims for declaratory relief.

V.

Hall challenges the district court's order denying leave to amend her complaint to include a § 1983 claim against Lutheran.[11]  The district court analyzed, in great depth, Hall's proposed amendment to the complaint and concluded that it was inadequate to state a claim because there was no basis to find that Lutheran was acting under color of state law.[12]  We review a district court's denial of a motion for leave to amend a pleading for abuse of discretion. *Rio Grande Royalty Co. v. Energy Transfer Partners, L.P.*, 620 F.3d 465, 468 (5th Cir. 2010) (citation omitted).  Denial of a motion for leave to amend is appropriate if "the proposed amendment would be futile because it could not

---

[10] The district court explained that "[a]lthough the Texas Supreme Court justices are the only parties who have moved for dismissal for lack of standing to seek injunctive and declaratory relief," the pleadings demonstrate that Hall lacks standing to proceed on her declaratory and injunctive relief claims.

[11] The district court dismissed Hall's state law claims against Lutheran pursuant to Rule 12(b)(6), however Hall has not appealed the dismissal of those claims.

[12] The district court also concluded that even if Hall could demonstrate that Lutheran was acting under color of state law, Hall's allegations were inadequate to state a claim.

survive a motion to dismiss." *Id.* (citation omitted).

We agree with the district court's conclusion that Hall failed to demonstrate that Lutheran was acting under color of state law. "To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988). Conduct by a private entity is not subject to suit under § 1983 unless the private entities' allegedly unconstitutional conduct is fairly attributable to the state. *See, e.g.*, *Cornish v. Corr. Servs. Corp.*, 402 F.3d 545, 549 (5th Cir. 2005) (citations omitted). Initially, in determining whether a deprivation of a protected right is fairly attributable to the state, we must identify "the specific conduct of which the plaintiff complains." *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 51 (1999) (quotation omitted). Here, that conduct involves Lutheran's alleged failures to "to exercise professional judgment in both its initial placement decision and in its oversight of Jasmine's care." At issue, therefore, is whether Lutheran's decision to place Jasmine in Cochran's home and its level of continuing oversight of the placement are fairly attributable to the State.

When considering whether a private entities' conduct can be fairly attributable to the State, the Supreme Court utilizes a number of tests. *Cornish*, 402 F.3d at 549 (describing the public function test, state compulsion test, the nexus or state action test, and the joint action test). The district court considered each test in depth, ultimately concluding that Lutheran was not a state actor. On appeal, Hall, albeit unclearly and without case support, argues only that Lutheran should be considered a state actor under the state compulsion test.[13] Hall argues that the contractual relationship between TDFPS

---

[13] Because Hall only identified error with the district court's analysis under the state compulsion test, we will not disturb its analysis on the remaining tests. *See Brinkmann v. Dallas Cnty. Deputy Sheriff Abner*, 813 F.2d 744, 748 (5th Cir. 1987). Accordingly, we do not

and Lutheran provided Lutheran with "financial incentives" to deprive Jasmine of her rights.

"Under the 'state compulsion test,' a private actor's conduct is attributable to the State when it exerts coercive power over the private entity or provides significant encouragement." *Id.*  There are no factual allegations that TDFPS exerted coercive power over Lutheran with regard to its placement decisions or monitoring responsibilities.  Hall's mere allegation that Lutheran had financial incentives to minimize its costs in providing its services does not demonstrate that TDFPS provided significant encouragement for Lutheran to abdicate its responsibilities under the contract to properly screen potential placements for foster children and to monitor those placements.[14]  As the district court astutely observed, it is the deviation from Lutheran's requirements as a child-placing agency that forms the basis for Hall's allegations, not the compliance with all applicable requirements that likely arise under the contract.  Based on the futility of Hall's § 1983 claim against Lutheran, the district court did not abuse its discretion in denying Hall leave to amend her complaint.

## VI.

Hall also appeals the district court's resolution of her § 1983 claim against Smith based on an alleged violation of Jasmine's substantive due process rights to personal security and reasonably safe living conditions while in foster care.[15]  The district court granted summary judgment over this claim in favor of Smith,

---

opine on whether, if applying the public function test, a private child placement agency could be considered a state actor with respect to the foster child placement decisions it makes pursuant to a contractual relationship with a state.  *See, e.g., Smith v. Beasley*, 775 F. Supp. 2d 1344, 1354 (M.D. Fla. 2011); *Harris ex rel. Litz v. Lehigh Cnty. Office of Children & Youth Servs.*, 418 F. Supp. 2d 643, 651 (E.D. Pa. 2005).

[14] Any contract providing a fixed sum for services potentially provides an incentive for a business to minimize costs incurred in providing those services.  This cost minimization incentive, without more, is insufficient to attribute a private entities' conduct to a state.

[15] Although Smith was sued under various other theories of liability, this is the only claim against Smith for monetary relief Hall has raised on appeal.

concluding that Smith was entitled to qualified immunity because Hall failed to demonstrate that Smith was deliberately indifferent to Jasmine's rights.

## A.

We review a grant of summary judgment de novo, applying the same standard as the district court. *Brumfield v. Hollins*, 551 F.3d 322, 326 (5th Cir. 2008). Our inquiry "is limited to the summary judgment record before the trial court." *Topalian v. Ehrman*, 954 F.2d 1125, 1131 n.10 (5th Cir. 1992). We must view the evidence in the light most favorable to the non-moving party, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986), and the movant has the burden of showing this court that summary judgment is appropriate. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Summary judgment is appropriate where the evidence demonstrates that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Brumfield*, 551 F.3d at 326; *see* Fed. R. Civ. P. 56(c). A genuine issue of material fact exists if a reasonable jury could enter a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

## B.

Qualified immunity protects government officials from money damages unless a plaintiff shows "(1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2080 (2011) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Id.* at 2083 (internal quotations omitted). Courts may exercise their discretion in deciding which question to answer first. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

C.

Hall's § 1983 claim against Smith, alleging a violation of Jasmine's rights to personal security and reasonably safe living conditions in foster care, is a substantive due process claim that requires proof that Smith acted "with deliberate indifference" toward Jasmine.[16] *Hernandez ex rel. Hernandez v. Tex. Dep't of Protective & Regulatory Servs.*, 380 F.3d 872, 880 (5th Cir. 2004). To act with deliberate indifference, a state actor must consciously disregard a known and excessive risk to the victim's health and safety. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). This court has emphasized that the test of deliberate indifference is a "significantly high burden for plaintiffs to overcome." *Hernandez*, 380 F.3d at 882 (citation omitted). A plaintiff must demonstrate culpability a degree beyond mere negligence, or even gross negligence. *Id.*; *see also James v. Harris Cnty.*, 577 F.3d 612, 617-18 (5th Cir. 2009) (internal quotations and citation omitted) ("Deliberate indifference is a degree of culpability beyond mere negligence or even gross negligence; it must amount to an intentional choice, not merely an unintentional oversight."); *Alton v. Tex. A&M Univ.*, 168 F.3d 196, 201 (5th Cir. 1999) ("Actions and decisions by officials that are merely inept, erroneous, ineffective, or negligent do not amount to deliberate indifference . . . .").

Liability based on deliberate indifference is inappropriate if an official can demonstrate "that [she] did not know of the underlying facts indicating a sufficiently substantial danger and that [she was] therefore unaware of the danger, or that [she] knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent."

---

[16] Hall contends that we should apply a professional judgment standard instead of the deliberate indifference standard. This court has concluded that the deliberate indifference standard is the appropriate standard for considering substantive due process claims based on foster children's rights to personal security and reasonably safe living conditions. *See Hernandez*, 380 F.3d at 880. We will not disregard this established precedent. *See In re Pilgrim's Pride Corp.*, 2012 WL 3239955, at *11 (5th Cir. Aug. 10, 2012).

*Farmer*, 511 U.S. at 844. Moreover, it is not enough to demonstrate than an official is aware of a substantial risk—rather, such an official "may be found free from liability if [she] responded reasonably to the risk, even if the harm ultimately was not averted." *Id.*

To begin, it is undisputed that Jasmine was in a medically fragile state at all points during her short life. Caring for Jasmine in this delicate condition required caretakers who not only were trained in providing adequate medical care, but also able to provide constant attention to her well-being. Considering these needs, Hall would successfully demonstrate that Smith was deliberately indifferent if there was record evidence supporting a conclusion that Smith consciously disregarded a known and excessive risk that Jasmine was not receiving the level of care she required for her survival. Hall alleges that Smith was aware that Jasmine was not receiving the level of care she required and consciously disregarded that risk. We will consider each of the facts emphasized by Hall on appeal in support of this allegation.

The summary judgment record[17] reveals that Hall, on several occasions, notified Smith of potential concerns regarding Cochran's ability to care for Jasmine. The first incident, in December 2008, involved Hall's observation that Jasmine was traveling without her oxygen monitor. Hall was very concerned and reported this incident several times to Smith. Second, after meeting Cochran for the first time, Hall asked Smith to conduct a background check on Cochran because her hygiene and personal appearance, at least in Hall's opinion, indicated that Cochran was a drug user.[18] It appears that Hall's concerns about Cochran's care were brought to Smith's attention in late 2008 or early 2009. In

---

[17] The district court considered evidence Hall provided after it initially granted Smith summary judgment in ruling on Hall's motion for reconsideration. We will also consider this evidence on appeal in reviewing Hall's § 1983 claim against Smith.

[18] Hall explains in her affidavit: "[Cochran's] hair was greasy, her nails and feet were dirty and her teeth were rotted [sic]. These were obvious signs to me that Cochran was using drugs."

addition to these concerns brought to Smith's attention by Hall, Smith received an e-mail on December 4, 2008 informing her that Cochran had declined ECI rehabilitative services for Jasmine.[19] It is undisputed that these were the only potential concerns that Smith was aware of regarding Cochran's ability to provide appropriate care for Jasmine.[20]

In light of these concerns expressed by Hall, we must consider Smith's involvement with Jasmine's case. After numerous hospital stays, Jasmine was placed with Cochran on October 8, 2008. Cochran, along with the other individuals who cared for Jasmine, was verified and trained by Lutheran, an agency specializing in child placement. Smith did not have a role in the selection of Jasmine's placement. During Jasmine's placement with Cochran, Smith was continuously involved in monitoring and documenting Jasmine's progress. She visited Jasmine approximately once a month and frequently communicated with Cochran and other members of the nursing staff who cared for Jasmine at Cochran's home. Each time that Smith met in person with Jasmine, Smith observed that all her medical equipment, including her oxygen monitor, was readily available. Monthly written evaluations regarding Jasmine's care contain multiple entries detailing interactions with Jasmine, her health condition, and the progress Jasmine was making. Contained in these detailed entries was a confirmation that Jasmine, by February 2009, was attending ECI sessions on a weekly basis to assist with her developmental delays. The evidence indicates

---

[19] It is unclear from the record whether Jasmine was receiving rehabilitative services from another provider at that time, but it is undisputed that by February 2009, Cochran had enrolled Jasmine in ECI rehabilitative services.

[20] Hall has failed to adequately explain how these concerns, even if Smith believed them to be accurate and consciously disregarded them, caused Jasmine's death. First, Hall speculates that Jasmine was not attached to the oxygen monitor at the time her tracheostomy tube disconnected; however, this is belied by the record, which indicates that Cochran and Lollis heard the alarm sound shortly after the tracheostomy tube disconnected. Second, Hall fails to tie the potential lapse in rehabilitative services for Jasmine to her death. It is undisputed that Jasmine received ECI services regularly after February 2009.

that Smith believed Cochran and the other individuals caring for Jasmine were providing her with the care she needed.

Although Smith did not make any specific inquiries into potential drug use by Cochran, given the nature of the suspicion expressed by Hall, Smith's response was reasonable. Specifically, Hall's warning was not a warning that Cochran appeared intoxicated, was arrested for using drugs, or had been seen using drugs—instead, Hall's stated basis for her suspicion was that Cochran's hair, nails, and feet were dirty and that she had rotting teeth. After receiving such speculative information, it was reasonable for Smith to rely on her regular observations of Cochran, ensuring that there were no signs of drug use. The summary judgment record is devoid of any indication that Smith had reason to believe, or actually believed, that Hall's concerns about Cochran's potential drug use or failure to use Jasmine's medical equipment as needed were accurate. Accordingly, because Smith, based on her observations, did not believe that the reports Hall made regarding Cochran actually gave rise to a substantial risk to Jasmine's health and safety, we conclude that Smith was not deliberately indifferent in allowing Jasmine to remain in Cochran's home. *See Hernandez*, 380 F.3d at 884 (concluding that an official was not deliberately indifferent to reports of child abuse because, based on her observations, she did not believe that there was a substantial danger of harm to the foster child, despite reports of abuse).

Hall's claims, however, are not limited to whether Cochran was qualified, but also encompass the alleged failure of Smith to ensure Dr. Edmonds' June 3, 2009 medical recommendation was followed.[21] At that time, Dr. Edmonds made

---

[21] Hall also criticizes Smith for her alleged failure to ensure that Jasmine received 24-hour nursing care. Smith was informed of Dr. Edmonds' recommendation on June 24, 2009. At this time, Jasmine was approved for 88 hours of nursing care each week. On July 1, 2009, Smith was informed that Jasmine was receiving 96 nursing hours each week and that Dr. Liaw had entered an order for 24-hour nursing care. It remains unclear if Jasmine was receiving 24-hour nursing care by July 11, 2009. Even if Jasmine was not receiving 24-hour nursing care, however, it could not be the basis for Hall's deliberate indifference claim against

it clear that Jasmine faced grave danger if her tracheostomy tube dislodged. Because Smith was obviously aware of a grave risk to Jasmine's health after Dr. Edmonds' warning, our focus is on whether Smith was deliberately indifferent to this known risk.

Considering the circumstances surrounding Dr. Edmonds' warning, although Smith's actions were not ultimately successful, or particularly commendable, her response was reasonable. First, the urgency of the surgery recommendation by Dr. Edmonds was, and remains, unclear. Smith believed that Dr. Edmonds explained that the surgery "may occur sometime this summer." In a letter sent to Dr. Liaw on June 3, 2009, Dr. Edmonds explained that the surgery should occur "as soon as is feasible," without providing any timetable. As late as July 8, 2009, Dr. Liaw indicated that he was not aware of when the surgery was going to be scheduled, but explained that: "I know it's coming up. I just don't know the exact date. I mean, that's what Dr. Edmonds had indicated to us, that he was going to plan for an operating time and schedule all that."

In addition to confusion around the urgency of the surgery, Smith was informed on June 10, 2009 that Jasmine required a second sleep study prior to the surgery. This study was not completed until July 7, 2009. During this period of time, it was reasonable for Smith to believe that the surgery had to be delayed until the second sleep study was completed. On July 8, 2009, Dr. Liaw testified that he believed it was in the best interests of Jasmine to remain in the Cochran home during the time leading up to her surgery, where he explained she was receiving all the care she needed. The court overseeing Jasmine's case ordered that Jasmine remain in Cochran's home until the surgery. The court also ordered TDFPS to communicate with Dr. Edmonds to schedule the surgery

---

Smith because two nurses were caring for Jasmine at the time her tracheostomy tube was dislodged. Jasmine's death did not result from a lack of nurses—rather, it was the distraction of a nurse providing care for Jasmine that might have contributed to Jasmine's death.

as soon as Jasmine was "capable of handling the surgery safely." Later that same day, Smith contacted Dr. Edmonds' office explaining this request. Smith was informed that Dr. Edmonds needed to review the results of the sleep study that occurred on July 7, 2009 prior to scheduling Jasmine's surgery.

Based on the record, although everyone involved understood that surgery was needed, it was not clear that the surgery had to occur before July 11, 2009. Actually, both doctors involved in Jasmine's case—Dr. Edmonds and Dr. Liaw—indicated that delaying the surgery was not inappropriate.[22] Smith's failure to do more to ensure that the surgery occurred prior to the incident on July 11, 2009, in light of these circumstances, does not constitute deliberate indifference. Furthermore, even though there was a heightened need for Jasmine to receive constant care and attention, Smith had no reason to believe that she was not receiving the appropriate level of care in June and July 2009.

We conclude that Smith was not deliberately indifferent to Jasmine's rights to personal security and reasonably safe living conditions during her foster placement with Cochran. Because we do not find that Smith violated Jasmine's constitutional rights, we do not need to consider the second prong of the qualified immunity analysis. The district court correctly determined that Smith was entitled to qualified immunity from Hall's § 1983 claim.

VII.

Finally, Hall challenges the district court's grant of summary judgment in favor of TDFPS on Hall's wrongful death claim. The district court concluded that Hall failed to properly articulate facts demonstrating that her claim fell within one of the three general exceptions to sovereign immunity under the Texas Tort Claims Act ("TTCA"), Tex. Civ. Prac. & Rem. Code § 101.001 *et seq.*

---

[22] For instance, the response by Dr. Edmonds' office that the second sleep study had to be considered prior to scheduling the surgery does not indicate that surgery was required immediately. Dr. Liaw, in contrast, deferred to Dr. Edmonds' scheduling and indicated that prior to the surgery, instead of being admitted into a hospital, Jasmine was better off in Cochran's home where she was receiving the care that he believed she required.

On appeal, Hall reiterates her argument that her claim against TDFPS falls within the exception to sovereign immunity "for death caused by a use of tangible personal property." *San Antonio St. Hosp. v. Cowan*, 128 S.W.3d 244, 245 (Tex. 2004). Waiver of sovereign immunity under this exception applies "only when the governmental unit is itself the user" of the property. *Id.* at 246; *see also Rusk State Hosp. v. Black*, No. 10-0548, 2012 WL 3800218, at *7 (Tex. Aug. 31, 2012) ("A governmental unit does not 'use' property within the meaning of the [T]TCA when it merely allows someone else to use it."). Hall explains that TDFPS's consent to Jasmine's surgery allowing doctors to insert a tracheostomy tube ultimately led to her death. Even if we assume *arguendo* that the use of the tracheostomy tube caused Jasmine's death,[23] it is clear that TDFPS did not "use" the tracheostomy tube. *See Black*, 2012 WL 3800218, at *7. Rather, TDFPS authorized surgeons at Memorial Hermann to conduct a strongly recommended surgery, a surgery which required the use of a tracheostomy tube. After surgery, Jasmine used the tracheostomy tube as part of her ongoing medical treatment. The record simply does not support a conclusion that TDFPS "used" the tracheostomy tube. *See id.* Accordingly, we conclude that TDFPS was entitled to summary judgment on Hall's wrongful death claim.

AFFIRMED.

---

[23] The district court relied on Hall's failure to demonstrate causation because Hall's claim focused on negligence in removing Jasmine from Cochran's care, not on the use of the tracheostomy tube. On appeal, Hall alters her explanation of causation, focusing on negligent oversight of the continuing use of the tracheostomy tube.